# SMITH, Plaintiff in Error, v. MUTUAL BENEFIT LIFE INSURANCE COMPANY.

### In Banc, March 20, 1903.

1. Insurance: PLACE OF CONTRACT. If the insured was a resident of this State and the application for the policy was made to an agent in this State, the policy issued in this State by a company incorporated by another State, is a Missouri contract.

2. ———: UNCONDITIONAL CASH SURRENDER VALUE. A provision in the policy that the surrender value is payable only on condition that it be applied for within three months from the non-payment of a premium due, and the policy then surrendered and cancelled, is not a provision for an unconditional cash surrender as required by the Missouri statute, and is such a limitation as takes the case out of the statute.

3. ———: EXTENDED INSURANCE: LOANS. In applying the net value of the policy to paying for extended temporary insurance, loans made to the assured by the company on the policy can not be

deducted from the net value of the policy. If the amount of the assured's indebtedness "on account of past premium payments" is deducted from the net value of the policy, and the balance if applied to the payment of premiums will extend the policy beyond the date of the assured's death, the company can not shorten that extended period by deducting the loans it has made to the assured. The Missouri statute authorizes no such deduction.

*Held,* by MARSHALL, J., dissenting, that the statute contains no prohibition against the assured agreeing that the total amount of the loans shall be deducted from the net value and that only the balance remaining after such deduction shall be applied to the purchase of extended insurance. The statute does not prohibit the assured from selling, pledging or assigning either the whole of the policy or his equitable interest in such net value of the policy.

4. ——: ——: ——: LOSS OF SECURITY. This provision of the statute will not be so changed as to allow loans to be deducted from the net value of the policy before its extended period is calculated, on the theory that, if the company is not permitted to do so, it would have no security for the loan. Such consideration can have no influence with the courts in interpreting the statute. The company holds the policy as collateral security for the loan, which may or may not prove of value, and besides it will be allowed to deduct the whole amount of the debt due it from the amount due the insured on the policy.

5. ——: ——: ——: AGREEMENT IN FACE OF STATUTE. An express agreement in the policy, or subsequently, that loans made the insured may be deducted from the net value of the policy in applying that value to extended temporary insurance, will not authorize such deduction, because the statute does not permit such a contract.

*Held,* by MARSHALL, J., dissenting, that the statute does permit the making of such a contract. The statute requires the company, without the assured being required to do or say anything, to employ three-fourths of the net value of the policy, after deducting any sum due for unpaid premiums, to the purchase of extended insurance. But another section of the statute empowers the assured to "surrender the policy to the company for any consideration adequate in his judgment," and in the face of that provision it would be hurtful to the assured, for whose benefit the insurance laws were enacted, to hold that the net value of the policy can be used only to buy extended insurance.

6. ——: ——: ——: RELATION OF PARTIES. The statute has no concern with the relation of borrower and lender between the insurance company and policy-holder, except when it relates to money borrowed from the company to pay premiums.

Appeal from Jackson Circuit Court.—*Hon. C. O. Tichenor,* Special Judge.

REVERSED AND JUDGMENT HERE.

*James H. Austin* for plaintiff in error.

(1)  Under section 5983, Revised Statutes 1879, and section 5856, Revised Statutes 1889, no policy of insurance on life, issued by any life insurance company authorized to do business in this State on or after August 1, 1879, after payment on it of two full annual premiums, could be forfeited by reason of the non-payment of premium thereon, but would be entitled to the benefits prescribed in said sections. The beneficiary of any such policy written after such date is entitled to the benefits of said statute, anything in the policy to the contrary notwithstanding. Clements v. Eq. Life Soc., 140 U. S. 226; Cravens v. Ins. Co., 148 Mo. 583. (2)  The policy does not contain a provision for an unconditional cash surrender value, or for an unconditional commutation of the policy to non-forfeitable paid-up insurance.  Under its provisions the assured is entitled to these, in the one case only "upon the written application by the owner of this policy and the surrender thereof to the company at Newark, within three months from non-payment of premium;" in the other only upon the "surrender of the policy, fully receipted, within the said three months," and these conditions apply whether there be a loan upon a policy or not. Under these provisions of the policy, it is made a condition precedent that the assured in either case shall surrender his policy, fully receipted, within three months from the non-payment of premiums. Such being the case, the policy is not brought within the first two exceptions mentioned in said section 5859, insisted upon by respondent.  Houthorne v. Ins. Co., 5 Mo. App. 73; Cravens v. Ins. Co., supra.  (3) Life insurance policies are liberally construed in favor of the assured so as not

to defeat, without a plain necessity, his claim to the indemnity, which, in making the insurance, it was his object to secure. If two interpretations may be made, that one should be adopted which is most favorable to the assured. May on Insurance (2 Ed.), sec. 175; Bliss on Life Insurance (2 Ed.), pp. 656, 657. Our statute concerning non-forfeiture of life insurance policies is a remedial statute and should be construed liberally so as to effectuate the benign spirit and purpose of its enactment. Vogler v. Montgomery, 54 Mo. 577; Sedgwick on St. and Const. Law, p. 366.

*J. Hugo Grimm* for defendant in error; *Dodd & Dodd, Charlton T. Lewis, Edward Lynam Short, James L. Blair* and *Frederick N. Judson* of counsel.

The policy meets and more than meets all the requirements of sections 5856, 5857, 5858, Revised Statutes 1889, and as plaintiff has already received $200 more by the terms of the policy than these sections secure the assured, she can not recover. Section 5856 must be read in connection with the remaining three sections of the act, and of the entire chapter on life insurance, and the legislative intent derived from the entire act. If this section is susceptible of a construction harmonizing it with the rest of the act, such construction will be adopted even if it requires the omission, addition or transposition of a word or phrase; and this is especially true where such construction avoids injustice and wrong and great public inconvenience. Railroad v. Gray, 126 Mo. 472; St. Louis v. Kane, 110 Mo. 254; State ex rel. v. Slover, 126 Mo. 652; State ex rel. v. Life Ins. Co., 44 Mo. 283; State ex rel. v. King, 44 Mo. 283; Greeley v. Railroad, 123 Mo. 157; State ex rel. v. Emerson, 39 Mo. 80; Dowdy v. Wamble, 110 Mo. 280; Connor v. Railroad, 59 Mo. 285; Bryant v. Russell, 127 Mo. 422; Andrew Co. ex rel. v. Schnell, 135 Mo. 31; Carson-Rand Co. v. Stern, 129 Mo. 381; Sutherland, Stat.

Constr., p. 288; U. S. v. Freight Assn., 166 S. W. 326; State ex rel. v. Diveling, 66 Mo. 375; Bank v. Skeen, 101 Mo. 687; Kane v. Railroad, 112 Mo. 34; Bowers v. Smith, 111 Mo. 45; Chouteau v. Railroad, 122 Mo. 375; Cole v. Skrainka, 105 Mo. 303; State ex rel. v. Herman, 70 Mo. 441; Plum v. N. C., 101 Mo. 525; State v. Bennet, 102 Mo. 356; Bingham v. Birmingham, 103 Mo. 345; Deardorf v. Roy, 50 Mo. App. 70; State ex rel. v. Field, 112 Mo. 554; Ross v. City of Kansas, 111 Mo. 18; Bowers v. Smith, 111 Mo. 45; State v. Howard, 119 Mo. 41; Fosburg v. Rogers, 114 Mo. 122. The policy in this case comes within three exceptions of section 5859, and therefore sections 5856, 5857 and 5858 are not applicable to this case.

## IN BANC.

PER CURIAM.—Upon a hearing of this cause by the Court in Banc the following opinion by VALLIANT, J., in Division One is adopted as the opinion of the court. *Brace, Gantt, Burgess* and *Valliant, JJ.*, concurring; *Robinson, C. J., Marshall* and *Fox, JJ.*, dissenting.

VALLIANT, J.—This is a suit on a policy of life insurance issued by the defendant, which is a New Jersey corporation, on the life of Samuel I. Smith for the benefit of his wife, the plaintiff, for $10,000. Smith and wife were residents of this State, the application was made to an agent of defendant in St. Louis, and the policy issued there; it is therefore a Missouri contract. There is no dispute on that point. The policy was issued June 10, 1884. The premiums were to be paid semiannually and were so paid up to and including the one due December 10, 1896, which continued the policy in full force up to June 10, 1897, when default in payment of the premium was made. Samuel I. Smith, the assured, died July 1, 1898. Plaintiff claims that by force of the statute, section 5856, Revised Statutes

1889, the net value of the policy applied, as in the statute required, to temporary insurance, carried it for its full amount to a date beyond that of the death of the assured, and that is unquestionably so, unless the facts relied on by defendant are sufficient to take the case out of the operation of the statute, or unless in estimating the net value of the policy as called for by the statute, the defendant is entitled to deduct the whole amount of indebtedness owing by Smith to it. There is little, if any, dispute as to the facts, and the differences as to the law come down at last to the question of whether or not the defendant is entitled to deduct from the net value of the policy, before investing it in extended temporary insurance, the cash loan made by it to Smith.

Defendant's position is that the non-forfeiture provision of the statute above mentioned, does not apply to this case for three reasons: First, that the policy contains an agreement for an unconditional cash surrender value greater than the net value called for in section 5856; second, that it contains an agreement for the unconditional commutation of the policy for non-forfeitable paid-up insurance of a larger value than that required by section 5857; third, that the laws of New Jersey, the home of the defendant corporation, prescribe, in such case, a surrender value or paid-up or temporary insurance and the policy sued on contains an agreement for such, in conformity to the laws of New Jersey.

A reference to the several sections of our statute on this subject is here necessary. Section 5856, Revised Statutes 1889, provides that no life insurance policy shall, after the payment of two full annual premiums, be forfeited for the non-payment of a further premium thereon, but shall be commuted as follows: "The net value of the policy, when the premium becomes due and is not paid, shall be computed upon the American experience table of mortality, with four and one-half per cent interest per annum, and after deduct-

ing from three-fourths of such net value any notes or other indebtedness to the company, given on account of past premium payments on said policy issued to the insured, which indebtedness shall then be cancelled, the balance shall be taken as a net single premium for temporary insurance for the full amount written in the policy, and the term for which such temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium,'' etc.

Section 5857 provides that in the contingency referred to, in the foregoing section, the policy-holder may, within sixty days, demand a paid-up policy for an amount that the net value as above computed would buy at the usual rates of the company.

Section 5858 provides that when the death of the insured occurs within the period of the extended insurance called for in section 5856 (no other condition of the original policy being broken except the non-payment of premium), the company shall pay the full amount that would have been due on the policy if no default in the payment of the premium had been made, ''anything in the policy to the contrary notwithstanding.''

Section 5859 provides that the three preceding sections shall not apply, ''if the policy shall contain a provision for an unconditional cash surrender value at least equal to the net single premium for the temporary insurance provided hereinbefore, or for the unconditional commutation of the policy to non-forfeitable paid-up insurance for which the net value shall be equal to that provided for in section 5857, or if the legal holder of the policy shall, within sixty days after default of premium, surrender the policy and accept from the company another form of policy, or if the policy shall be surrendered to the company for a consideration adequate in the judgment of the legal holder thereof.''

From the beginning, by agreement, the assured borrowed of defendant, thirty per cent of the premium each year, which loans bore six per cent interest; the balance of the premium he paid in cash and received at each payment a renewal receipt which showed the amount of the premium loan to date. When the premium due December 10, 1895, was required, the assured applied to the company for a loan of the whole amount thereof. This application resulted in an agreement, of date January 28, 1896, between the assured and the beneficiary on the one part and the company on the other, whereby the company was released from the non-forfeiture clause in the original policy, and in lieu thereof the parties agreed that certain other non-forfeiture provisions (which will be hereinafter shown) should be incorporated in the policy. Thereupon the company loaned the assured the full amount of the premium due at the time, $144.40 which carried the policy paid-up to June 10, 1896. This transaction brought the amount of the assured's indebtedness for loans on account of past premiums up to $915.10. Then on May 8, 1896, the assured applied to the company for a loan of cash, and the company agreed to lend him $672.10, out of which it would deduct interest on the previous loan up to December 10, 1896, interest on the increased loan to same date, and the premium due December 10, 1896, leaving $485.14, to be delivered to the assured in cash, all of which was done. This raised the amount of the indebtedness of the assured to the company to $1,587.20, which up to the date of the failure to pay the premium was by interest increased to $1,634.92. This includes the $485.14 cash loaned the assured. Now, if in estimating the net value of the policy, as required in section 5856, the defendant is entitled to deduct that $485.-14 and interest, and if that section of the statute governs the case, then the net value was sufficient to carry the policy as extended temporary insurance only to September 7, 1897, but if the statute governs and if the de-

fendant was not entitled to so deduct the cash loan, then the net value of the policy was sufficient to carry it as extended temporary insurance to a date beyond July 1, 1898, which was the date of the death of the assured. There is no necessity for arraying the figures here which are given by the actuaries and presented in the briefs of counsel, because whether we adopt the calculation of the one or the other, the result is as above stated. Does section 5856 apply to this case? Defendant says it does not, because—first, the policy as amended under the agreement of January, 1896, contains a provision for an unconditional cash surrender value at least equal to the net single premium required by section 5856; second, that it contains a provision for the unconditional commutation of the policy of larger value than that called for in section 5857; and third, that it conforms to the laws of New Jersey in respect to non-forfeiture, extension and commutation. The clause of the amended policy relied on to sustain this contention is as follows:

"When after two full annual premiums shall have been paid on this policy it shall cease or become void solely by the non-payment of any premium due, its entire net reserve by the American experience mortality and interest at four per cent yearly (provided there be no loan on the policy) shall be applied by the company as a single premium at the company's rates published and in force at this date, either, first, to the purchase of non-participating term insurance for the full amount insured by this policy, or, second, upon the written application by the owner of this policy and the surrender thereof to the company at Newark within three months from such non-payment of premium, to the purchase of a non-participating paid-up policy payable at the time this policy would be payable if continued in force. Both kinds of insurance aforesaid will be subject to the same conditions, except as to payment of premiums, as those of this policy. Third, if preferred, the company will, on surrender of the policy fully receipted within the

.Vol 173 mo—22

said three months, pay as a cash surrender value its entire net reserve by the American experience mortality and interest at four and one-half per cent yearly, less a surrender charge equal to one per cent of the sum insured by the policy.

"If there be any loan on the policy such indebtedness shall be paid off out of the cash surrender value, and the remainder paid in cash by the company; or a value will be allowed by the company in the form of extended or paid-up insurance, as above provided, the amount to be applied to the purchase of such insurance being correspondingly reduced in the ratio of the indebtedness to the full cash surrender value.

"If death shall occur within one year after the non-payment of premium and during the term of extended insurance, there shall be deducted from the amount payable any premium that would have become due on this policy if it had continued in full force, also the amount of any indebtedness on this policy at the time of such non-payment of premium.

"The company will at any time while the policy is in force loan up to the limit secured by its cash surrender value upon a satisfactory assignment of the policy to the company as collateral security."

From this it appears that whilst the net value of the policy is to be computed on a four per cent basis instead of a four and one-half per cent basis as our statute calls for, and in that respect is more favorable to the policy-holder, yet it authorizes the company to deduct from the amount so computed all indebtedness of the assured to the company, which, if the plaintiff's interpretation of the statute is correct, is very much less favorable to the policy-holder. Besides, the surrender value is payable only on condition that it be applied for within three months and the policy then surrendered and cancelled. That is not a provision for an unconditional cash surrender as required in section 5859. [Cravens v. N. Y. Life Ins. Co., 148 Mo. 583.] A like

condition is attached to the right of the policy-holder
to a paid-up commuted policy. The requirement of a
surrender of the original on the issuance of the new
commuted policy would not be regarded as such a con-
dition as would prevent the case falling within the pro-
vision of section 5859, because the surrender of the old
policy would be the natural result of the issuance of the
new policy, but the limitation to three months is a ser-
ious condition, and does take the case out of that section.
Defendant's third ground for holding the Missouri
statute does not apply, is based on the amendment of
section 5859 by the Act of 1895 (Laws 1895, p. 197).
That amendment, in so far as it is claimed to affect this
case, is: "If the policy shall have been issued by any
company authorized to do business in this State, and
organized under the laws of another State of the United
States which prescribes a surrender value or paid-up
or temporary insurance in case of default of payment
of premiums, and shall contain an agreement for such
surrender value, temporary or paid-up insurance, as
prescribed by such other State as a part of said policy,"
then the Missouri statute is not to apply.

Plaintiff contends that this amendment would not
affect this case even if the facts brought it within its
terms, because the policy was issued in 1884 and could
not be affected by a statute, passed after that date, whilst
defendant insists that as the amendment was passed in
1895, it was in force when the change in the policy was
made in 1896 and governs the case. The question of
the application of that amendment to this case is really
not before us, because the counsel for defendant in their
brief, virtually concede that the policy as amended does
not conform to the New Jersey law on this point, but
they say, "We make the point as it presents an inter-
esting question upon which other cases may turn."

We are satisfied that the Missouri statute, section
5856, Revised Statutes 1889, governs in this case, and
this brings us to the consideration of the point on

which the defendant seems chiefly to rely and on which the case turned in the mind of the learned trial judge,. that is, as defendant contends, that in estimating the net value of the policy for extended temporary insurance, section 5856 authorizes the insurance company to deduct not only the amount of loans made to the assured for payment or part payment of premiums to keep the policy alive, but also cash loaned him to be otherwise used as he might see fit. The argument is made for defendant that unless the company be allowed to so deduct the amount it would have no security for the loan. The defendant has the policy transferred to it as collateral security for the loan, and in this instance at least, the policy is ample security because the defendant will be allowed to deduct the whole amount of the debt due it from the amount due the plaintiff on the policy. Of course, if the assured should live beyond the period of the temporary insurance, the policy would become extinct and the defendant would have only the personal liability of the estate of the assured to depend on. But, as the assured might die within the extended period of the policy, we can not say that there was no security at all. Such policies doubtless have some commercial value available in the market as collateral securities, varying, of course, according to the circumstances of the case. But we have nothing to do with that. Such considerations can have no influence in construing this statute. If the defendant advanced. the $485.14 to the assured believing that it would have the right to deduct it from the net value of the policy in case of non-payment of premium, before applying it to the payment of extended temporary insurance, whether because it so interpreted our statute or because it considered that the terms of the policy as amended superseded the provisions of the statute, it did so under a mistaken view of the law. Our law deems the subject of life insurance one that requires especial protection, and in this particular, it has provided that the

policy-holder shall have the benefit of the extended temporary insurance specified in section 5856, "anything in the policy to the contrary notwithstanding." Therefore, though a policy should expressly declare that it was agreed between the insurer and the insured that the provisions of the statute relating to extended temporary insurance or commutation should not apply, still they would apply. And if the parties could not in the beginning place themselves outside the policy of the law, they could not by an amendment to the contract do so. There is a great deal of technical learning in the subject of life insurance and our lawmakers have proceeded on the theory that the average man who takes out a policy on his life is not equal in skill and learning in the technicality of that subject to the experienced officers of the insurance company, and for that reason have written into such contracts some provisions which the parties to them can not avoid. We hold, therefore, that the provisions of our statutes could no more have been avoided by the amendment to the policy in 1896, than by the original policy. And we hold, also, that the statute declaring that in ascertaining the net value of the policy it "shall be computed upon the American experience table of mortality with four and a half per cent interest per annum, and after deducting from three-fourths of such net value any notes or other indebtedness to the company, given on account of past premium payments on said policy issued to the insured, which indebtedness shall then be cancelled, the balance shall then be taken as a net single premium for temporary insurance for the full amount written in the policy," does not mean that indebtedness incurred by the assured for money borrowed from the company may also be deducted. The statute means only what it says, that indebtedness on account of past premium payments shall be deducted.

It is insisted by the learned counsel for the defendant that this plaintiff and her husband in his lifetime

have already drawn from the company the full amount of the cash surrender value of the policy and more, and that it would be unjust to allow her now to have the benefit of it applied as a premium for temporary insurance. True the plaintiff's husband did obtain that amount of money from the company, but not after default in the payment of the premium, not after the provisions of the statute under discussion took effect, not as in payment to him of the cash surrender value of the policy, but he obtained it as a loan for which he executed his note and gave collateral security and for which his estate is liable to the defendant, and for which also the defendant holds the policy in suit as security.

This statute does not undertake to regulate all business transactions that may occur between the life insurance company and a policy-holder; it only puts its hand into the contract of life insurance; it deals only with the subject of insurance and premium, and if the parties choose to assume toward each the relation of borrower and lender of money other than to pay the premium, this statute has no concern with that relation.

One of the expert witnesses for the defendant stated that in his opinion all the indebtedness was on account of past premiums, but he did not make his theory clear. The opinion can not outweigh the fact that part of it was for cash loaned for another purpose. Again, it is insisted that the defendant had the right to deduct the whole indebtedness out of the net value of the policy before applying it to the payment of temporary insurance, because the assured and the plaintiff had assigned the policy to defendant as collateral security for the loan. The borrowing of the money for a purpose other than the payment of a premium and the assignment of the policy as collateral security for the loan, put the parties, as to that item, in a new relation to each other. By virtue of the policy, and the premium, the parties stood in the relation of insurer and insured, and the law of insurance governed them in that relation, but

when the assured borrowed money of the insurer and assigned the policy as collateral security, the law governing their rights in that respect is the same as if he had borrowed the money from a bank and given it the same collateral. In such case, the bank would have been entitled to a lien on the proceeds of the policy but not to appropriate to itself the premium which was to keep the policy alive.

At the close of the transaction of May 8, 1896, the assured was indebted to the defendant in the sum of $1,587.20, and that sum included interest up to December 10, 1896. On July 1, 1898, when the assured died, that sum had increased by interest at six per cent to $1,735.59, which amount deducted from $10,000, the amount due plaintiff on the policy, leaves $8,264.41, which sum with interest at six per cent per annum from July 1, 1898, is the amount with costs for which plaintiff should have recovered judgment in the circuit court. As we have all the facts before us, justice will be best served by entering judgment here without remanding the cause. The judgment of the circuit court is reversed, and judgment for the plaintiff is entered here for $8,264.41, with interest at six per cent per annum from July 1, 1898, to date, and costs in both courts.

All concur.

## DISSENTING OPINION.

MARSHALL, J.—I am unable to agree with the majority opinion in this case, and because a simple dissent will not adequately express my opinion, and because of the grave consequences that will necessarily result from the rules of law as enunciated in the majority opinion, I herewith, as briefly as possible, state my views.

The decision in this case depends upon the proper construction to be placed upon section 5856, Revised Statutes 1889 (being sec. 7897, R. S. 1899). That section is as follows:

"Sec. 7897. No policies of insurance on life here-after issued by any life insurance company authorized to do business in this State, on and after the first day of August, A. D. 1879, shall, after payment upon it of three annual payments, be forfeited or become void, by reason of non-payment of premiums thereof, but it shall be subject to the following rules of commutation, to-wit: The net value of the policy, when the premium becomes due, and is not paid, shall be computed upon the actuaries' or combined experience table of mortality, with four per cent interest per annum, and after de-ducting from three-fourths of such net value, any notes or other evidence of indebtedness to the company, given on account of past premium payments on said policies, issued to the insured, which indebtedness shall be then cancelled, the balance shall be taken as a net single pre-mium for temporary insurance for the full amount writ-ten in the policy; and the term for which said temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium, and the assumption of mortality and interest aforesaid; but, if the policy shall be an en-dowment, payable at a certain time, or at death, if it should occur previously, then, if what remains as afore-said shall exceed the net single premium of temporary insurance for the remainder of the endowment term·for the full amount of the policy, such excess shall be con-sidered as a net single premium for a pure endowment of so much as said premium will purchase, determined by·the age of the insured at the date of default in the payment of premiums on the original policy, and the table of mortality and interest aforesaid, which amount shall be paid at end of original term of endowment, if the insured shall then be alive."

In this case the assured did not pay all of the premiums in cash, but thirty per cent thereof was evi-denced by a note given to the company, and the sum of such notes was due on June 10, 1896. The assured

also owed the company at that time other sums of money that he had borrowed from the company and to secure which he had pledged the policy to the company. On June 10, 1896, the net value of the policy amounted to $1,769.30. The assured then owed the company, on account of the thirty per cent of premiums paid by notes as aforesaid, and on account of money loaned on the security of the policy, the sum of $915.10. He was unable to pay the premium that fell due June 10, 1896, and thereupon he applied to the company for a loan of $672.10, out of which the premium due June 10th was to be deducted. This was accorded by the company. This brought his indebtedness to the company, with interest thereon, up to $1,634.92. The company deducted this sum from the three-fourths of the premiums, with interest thereon, and a dividend due on that day added, and applied the balance to the purchase of extended insurance, which balance was sufficient to carry the policy only to September 7, 1897. If only the thirty per cent premiums that were evidenced by the notes had been deducted from the said net value of the policy, the balance would have carried the policy beyond July 1, 1898, the day on which the assured died.

When the arrangement of June 10, 1896, was perfected the assured and his wife, the plaintiff herein, assigned the policy to the company as security. That assignment was as follows:

"This is to certify that we have this day borrowed from The Mutual Benefit Life Insurance Company the sum of fifteen hundred eighty-seven and 20-100 dollars, to secure the payment of which we hereby assign, transfer and set over to the said company policy No. 119009, issued by said company, and all sum or sums of money, interest, benefit and advantage whatsoever, now due or hereafter to arise or become due by virtue thereof; to have and to hold unto the said company, its successors and assigns forever, as collateral security for the payment of said loan, with interest thereon from the date

hereof at the rate of six per cent per annum, payable as the premiums on said policy become due.

"It is understood and agreed that if the interest shall not be paid when due, either in cash or by dividend, it shall be added to the principal of the loan, and that if, owing to the non-payment of interest, the principal of the loan shall ever equal or exceed the then cash surrender value of the policy, the policy shall thereupon become null, void, and be surrendered to the company, in consideration of the cancellation of the loan."

The crucial question, therefore, is whether the company was entitled to deduct from three-fourths of the net value of the policy the total sum due it by the assured for notes given for the thirty per cent of premiums paid in notes and for loans made to the assured on the security of the policy, or whether said section of the statute prohibits anything from being deducted from such three-fourths of such net value except "any notes or other indebtedness to the company, given on account of past premium payments on said policy."

Or, in other words, whether the statute was intended to prohibit the assured from borrowing money on the policy, and agreeing that if the premiums were not paid the loan should be deducted from the three-fourths of the said net value, in addition to the indebtedness for premiums, before the balance should be applied to the purchase of extended insurance.

The majority opinion concedes that the assured has a right to borrow money and to pledge or assign the *policy* as security for the loan, but it denies that under the statute, the assured could legally agree that the amount of such loan should be deducted from the three-fourths of the net value of the policy aforesaid. And right here is where we have "come to the parting of the ways," and I disagree with the opinion.

It is a mathematical axiom that the whole embraces all its parts, and all the incidents thereto belonging. So the policy embraces all the parts and all the inci-

dents, rights and benefits belonging thereto.  Hence, it is wholly illogical to say the policy can be pledged or assigned, but that the incident to the policy, the three-fourths of the net value at the time of default in the payment of a premium, can not be assigned.  Either it ought to be held that a policy could not be pledged or assigned at all, or else it ought to be held that anything of value belonging to the policy—whether it be the whole or only a component part thereof—can be pledged or assigned.  There can be no middle ground.  It will not do to say that the statute permits the one but prohibits the other.

There is nothing in the letter, context, spirit and meaning or object and purpose of the statute that affords support for such a construction of that section of the statute.  The words of the statute contain no such prohibition against the pledge of the policy or any of its incidents or parts to secure a loan, nor against the assured agreeing that the total amount of the loans shall be deducted from the net value and only the balance remaining be applied to the purchase of extended insurance.  The object and purpose that caused the enactment of this statute, was to cure the evil that theretofore prevailed of an insurance company declaring a policy forfeited if any premium was not paid promptly, and thereby getting the benefit of all premiums that had been previously paid.  The law books are full of cases where insurance companies had been guilty of such practices.  It had become a matter of common information that as long as the assured was in good health, the company would take the premium even if it was not promptly paid, but if his health failed and there appeared a probability of a loss, the agents of the company were instructed to "watch them like a hawk" (James v. Ins. Co., 148 Mo. l. c. 9), and if the premium was not promptly paid to forfeit the policy.

It is also a matter of common knowledge that the premiums charged are average premiums.  That is, the amount charged when the assured is young and when

the policy is first taken out, is in excess of the risk run, while the premium paid when the assured grows old, is not as much as the risk would require if the policy was taken out at that age. Therefore, by as much as the excess charged when the policy is young exceeds the risk run, that is, the cost of carrying the risk, there is an equitable interest properly belonging to the assured in such excess. [Since writing this opinion, my attention has been called to the case of N. Y. Life Ins. Co. v. Statham, 93 U. S. 24, which fully sustains what is here said.] Recognizing this, and in order to cut out the evils of absolute forfeitures that formerly prevailed, and to preserve to the assured this equitable interest in such excess, our lawmakers have declared that any insurance company that desires to do business in this State shall do so on the terms prescribed, that is, that after the payment of three annual premiums the policy shall not be forfeitable, but if the assured fails to pay a premium, the net value of the policy shall be ascertained, in the manner prescribed by the section quoted, and that three-fourths thereof shall be ascertained, and from that sum anything the assured owes the company for past premiums shall be deducted, and the balance shall be used to purchase extended insurance. Thus the Legislature annihilated the evil and created a trust estate in the premiums paid in favor of the assured. And this law was held valid by the Supreme Court of the United States. [Equitable Life Society v. Clements, 140 U. S. 226.] This was absolutely all the lawmakers intended to do when they enacted this law. It is perfectly plain that the Legislature never intended to prohibit the assured from selling, pledging or assigning either the whole of his policy or his equitable interest in such net value of the policy. That this is true is conclusively shown by the following considerations: Prior to the adoption of this statute there was no such thing known as an assured being able to borrow money upon the security of a policy on his life. Creditors often took life policies as security for

past due debts, knowing they had to keep up the premiums, if the assured did not do so, and to wait for his death for their money. But the assured could not borrow money on his policy. This law gave an actual, cash, ascertainable value to the policy, which it did not theretofore possess. It made it a thing of value in the market. It enabled the assured to borrow money upon the policy as security. It offered substantial and safe security to the company or person lending the money, which neither the assured nor any one else could take away. No failure to pay a premium could take this security away, for after three premiums had been paid the policy was non-forfeitable.

But what was the value thus given to the policy. Manifestly it was not the amount written in the face of the policy. The assured could not borrow that amount any more after this law was passed than he could have done before. It was the net value; the surrender value. It was the sum that could be obtained and applied to the payment of the money borrowed, from the equitable interest in the premiums paid. It was, under our statute, three-fourths of the net value after deducting any sum due for unpaid premiums. This was the thing of value that the lender had in his reach whenever the assured failed to keep the premiums paid up.

If this sum be not available to pay such loans at such times; if the balance of such net value after deducting what is due for unpaid premiums must be applied, as the majority opinion holds is the law, to the purchase of extended insurance, and the extended policy only is security for the loan, then it will be impossible for any assured to borrow any money on his policy, and in this way a thing of commercial value to the assured, that has tided many a man over financial shoals and saved him from bankruptcy, will be struck down and utterly destroyed, and the assured will be the only loser. That the Legislature never intended such a thing seems to my mind absolutely clear. This right, this thing of value, was unknown when this act was passed.

Therefore the Legislature could not have intended to prohibit a practice, to cut off a right, that they never heard of and that at that time had no existence.

I concede that in creating this new thing of value the lawmakers had a right to throw around it any restriction they saw fit, even to the extent of saying, if they chose, exactly how it should be invested and of prohibiting even the insured from using it or enjoying it in any manner contrary to the statute which created it. But I do not think the Legislature ever intended in passing this statute to do anything more than to preserve this portion of the premiums to the insured, and did not intend to prohibit the insured from making any other kind of a contract for his own benefit with reference thereto, except such a contract as would waive those benefits and turn them over to the company.

In construing this section of our statute (as also sections 5857, 5858, and 5859, which relate to the same subject) the Supreme Court of the United States, speaking through Mr. Justice GRAY, in Equitable Life Society v. Clements, 140 U. S. l. c. 233, said:

"The manifest object of this statute, as of many statutes regulating the form of policies of insurance on lives or against fires, is to prevent insurance companies from inserting in their policies conditions of forfeiture or restriction, except so far as the statute permits. The statute is not directory only, or subject to be set aside by the company with the consent of the assured; but it is mandatory, and controls the nature and terms of the contract into which the company may induce the assured to enter. This clearly appears from the unequivocal words of command and of prohibition above quoted, by which, in section 5983, 'no policy of insurance issued by any life insurance company authorized to do business in this State' 'shall, after the payment of two full annual premiums, be forfeited or become void, by reason of the non-payment of premiums thereon, but it shall be subject to the following rules of commuta-

tion;' and, in section 5985, that if the assured dies within the term of temporary insurance, as determined in the former section, 'the company shall be bound to pay the amount of the policy,' 'anything in the policy to the contrary notwithstanding.'

"The construction is put beyond doubt by section 5986, which, by specifying four cases (two of which relate to the form of the policy) in which the three preceding sections 'shall not be applicable,' necessarily implies that those sections shall control all cases not so specified, whatever be the form of the policy.

"Of the cases so specified, the only ones in which the terms of the policy are permitted to differ from the plan of the statute are the first and second, which allow the policy to stipulate for the holder's receiving the full benefit, either in cash, or by a new paid-up policy, of the three-fourths of the net value, as determined by sections 5983 and 5984. The other two cases specified do not contemplate or authorize any provision in the contract itself inconsistent with the statute; but only permit the holder to surrender the policy, either in lieu of a new policy, or for a consideration adequate in his judgment. In defining each of these two cases, the statute, while allowing the holder to make a new bargain with the company, at the time of surrendering the policy, and upon such terms as, on the facts then appearing, are satisfactory to him, yet significantly, and, it must be presumed, designedly, contains nothing having the least tendency to show an intention on the part of the Legislature that the company might require the assured to agree in advance that, he would at any future time surrender the policy or lose the benefit thereof, upon any terms but those prescribed in the statute.

"It follows that the insertion, in the policy, of a provision for a different rule of commutation from that prescribed by the statute, in case of default of payment of premiums after three premiums have been paid; as well as the insertion, in the application of a clause by

which the beneficiary purports to 'waive and relinquish all right or claim to any other surrender value than that so provided, whether required by a statute of any State, or not;' is an ineffectual attempt to evade and nullify the clear words of the statute."

This statute was intended as a benefit to the assured. It was not intended to prohibit the assured from making any contract he chose for his own benefit, as to the net value so preserved to him. It was not even intended to absolutely command that such net value, after the amount due for past premiums is deducted, should be used solely for the purchase of extended insurance. For if this had been the intention of the law, the lawmakers would never have enacted sections 5857 and 5859.

Those sections clearly confer upon the assured a right to use this net value in some other manner than for the purchase of extended insurance. Thus instead of using such net value to purchase extended insurance for the sum written in the policy for such a time as that net value would carry a policy for such a sum, section 5857 allows the insured to demand that such net value shall be used to buy a paid-up policy, and it prescribes the rule for ascertaining what amount of paid-up insurance such net value will buy. And section 5859 further provides: "The three preceding sections shall not be applicable in the following cases, to-wit: If the policy shall contain a provision for an unconditional cash surrender value at least equal to the net single premium for the temporary insurance provided hereinbefore, or for the unconditional commutation of the policy to non-forfeitable paid-up insurance for which the net value shall be equal to that provided for in section 5857, or if the legal holder of the policy shall, within sixty days after default of premium, surrender the policy and accept from the company another form of policy, or if the policy shall be surrendered to the company for a consideration adequate in the judgment

of the legal holder thereof, then, and in any of the fore-going cases, this act shall not be applicable.''

From which it clearly appears that under the law after two (now three) annual premiums have been paid, the policy shall not be forfeited, but that the company shall employ three-fourths of the net value of the pol-icy, after deducting any sum due for unpaid premiums, to the purchase of extended insurance, without the assured being required to do or say anything. But the assured may have other arrangements made for his benefit, that is, under section 5857 he may demand a paid-up policy in such sum as that much money will buy, or under sec-tion 5859 he may, in the policy, provide that instead of such extended insurance or such paid-up policy he shall be entitled to such net value in cash, or he may provide for the surrender of such policy and the issuance of a new policy, or *he may surrender the policy to the com-pany for a consideration adequate in his judgment.* And this right last mentioned is not required to be re-served in the policy. It is reserved to him by the law. It is a recognition of the right of the assured to deal with this fund as he sees fit.

It can not, therefore, be properly said that section 5856 absolutely requires the net value to be invested in extended insurance, nor that it prohibits the assured from dealing with it as specified in sections 5857 and 5859.

It would be very hurtful to the insured to hold that section 5856 only permitted the net value to be used to buy extended insurance. For if this was the law, the company could not thereafter be required to accept any other premiums on the policy and the policy would cease when the extended term expired. In other words, it amounts to the purchase of that much insurance for that length of time. If the assured died before the ex-piration of the extended insurance, of course his rep-resentative or the named beneficiary would get the

Vol 173 mo—23

amount of the policy. But if the assured did not die during the period of extended insurance, the policy would cease with the expiration of the extended period, and then the lately insured person would have to take out new insurance and pay premiums fixed for original insurance at that time of life, or if he could not then stand a physical examination he could get no insurance. In addition, no man would lend a dime on a policy of insurance if that was the law, because, all the insured would have to do to cut off the security of the lender, would be to stop paying premiums, require the company to use the net value to purchase extended insurance, and then if he lived beyond the extended period the policy would cease and the security be lost. Such a rule would not make it certain that the lender would get his money even at the death of the insured, unless he died within a certain time, which would be before the end of his life expectancy.

But it is said that these laws were not made for the benefit of money-lenders. That is true. They were made for the benefit of the assured. The right to borrow money on the policy is for the benefit of the assured. Without this law the company would lend its money to others who had other security to offer, but without this law, construed as I construe it, the assured could borrow no money on the policy.

It is said, however, that if the insured is permitted to borrow money on the policy, the lender could come in at any time, surrender the policy and collect the net value of the policy in cash, and thus cut out the very life of the policy. This is a total misapprehension of the law. The assured could always prevent such a thing from happening by keeping the premiums paid up. As long as the premiums were kept paid up the company could not, and would not, accept a surrender of the policy and pay the net value in cash. But it is said that by allowing the insured to borrow money on the policy, the benefit of extended insurance or a paid-up policy is

taken away from the insured. Be it so, if such is the result, it is a result that can only be brought about by the act and contract of the insured himself, and this law was intended to protect him against the company, not against himself.

Moreover, even if all that is thus said against allowing the insured to borrow money on the policy be true, it does not cover the case. For section 5859 expressly permits the insured at any time within sixty days after he has made default in payment of a premium, to surrender the policy for any consideration he deems adequate. This right exists by virtue of the law, and whether the policy contains a reference to it or not, it exists and can not be taken away from the insured by any one. It is therefore a thing of value—it is property. If it is something the insured can do for himself, it is something he can authorize an agent to do for him. If this is true, it is wholly immaterial at what time he gives the power to his agent, whether before or after the failure to pay the premium. If he may delegate this power to an agent, he may also direct the agent what to do with the consideration or money that was received from the company. This he may do by an assignment of the policy, a pledge of the policy, or an express power of attorney to collect the money and an express direction how the money shall be applied.

It follows inexorably that the lawmakers never intended to prohibit an insured from borrowing money on a policy, nor did they absolutely require the net value of the policy to be used to buy extended insurance, but they directly gave the assured the right, instead of taking extended insurance for a limited time, to demand a paid-up policy for such sum as such net value would buy, or instead of any such arrangement, it gave the assured the right to contract in the policy that he should be entitled to take the net value in cash, and also, without it being so nominated in the policy, it gave him a right to surrender the policy to the company for a consideration

deemed adequate by him. And all these rights which he might exercise, he had a right to authorize another to exercise for him.

For these hastily-thrown-together reasons I am constrained, very reluctantly, to dissent in this case. *Robinson, C. J.,* and *Fox, J.,* concur in the within.