THE STATE ex rel. HICKMAN, Supervisor of Building and Loan Associations, Appellant, v. PREFERRED TONTINE MERCANTILE COMPANY et al.

In Banc, October 27, 1904.

1. **INTERSTATE COMMERCE:** Constitutionality of Statute. Where the defendant is a domestic corporation and is not engaged in interstate commerce, the question of whether an act which does not on its face have any reference to interstate commerce is or is not violative of the United States Constitution, is not to be considered in determining its right to do business in this State.

2. **CO-OPERATIVE COMPANIES: Act of 1903: Conferring Judicial Powers Upon Ministerial Officer.** The Act of 1903, regulating home co-operative companies and prescribing certain conditions to be complied with by them for fulfilling their contracts, among others to deposit at least $25,000 with the State Treasurer for redeeming their contracts, and to file certified copies of their articles of association and by-laws and a statement of their plans of doing business and the forms of the contracts with a supervisor, and requiring him to issue to them certificates authorizing them to do business in the State if they have complied with the statute, is not unconstitutional as conferring judicial or legislative powers upon the supervisor.

3. ———: ———: **Co-operative Diamond Company.** The defendant company, with a capital of $10,000, entered into contracts with third parties that if they would pay one dollar a week for

one hundred and ten weeks, it would give them a commercial, white, clear, flawless diamond, weighing two carats, for which any reliable jeweler would pay $160 in cash. It did not invest the money paid in, but promised to place eighty cents of each dollar paid in into a redemption fund and out of that fund to redeem the oldest outstanding contract as soon as there was enough money in the fund to do so, and thus to continue thereafter. Thus the only certainties attaching to the plan are that the company will retain twenty per cent of all the money it receives, and that every time a contract is received the company will lose $72, and already it has redeemed enough contracts to more than exhaust its original capital, and the only way it can redeem any of its contracts already matured is to use the money hereafter received on later contracts. *Held,* first, that the business done by the company is such as brings it clearly within the provisions of the statute of 1903 (Laws 1903, p. 110); and, second, the company having failed to make the deposit with the State Treasurer for the redemption of its contracts which that act requires, and having failed to obtain a license from the supervisor to do business as the act requires, and there being nothing in its charter authorizing it to carry on such a business, it has no authority to do business in this State, and being clearly insolvent and certain to grow more so, as its plan of redeeming contracts clearly shows, it should be held insolvent and its business wound up.

4. **ACT OF 1903: Due Process of Law.** Where a statute does not take away from a defendant any right except as a result of a judgment of a court of competent jurisdiction, he is not denied due process of law.

5. ———: **Receiverships.** The fact that the receiver and his attorney are by the terms of a statute to be paid out of the assets of a company which the statute requires to be wound up because of its failure to comply therewith, does not constitute the taking of the company's property without due process of law.

6. ———: **Impairment of Contracts.** Wherein the statute requires certain co-operative companies to deposit with the State Treasury a specified sum for the redemption of its contracts, the purpose being to secure to the citizens of the State protection' against a breach of the contracts, those then existing as well as those thereafter entered into, it does not violate the constitutional provision against the impairment of contracts.

7. ———: **Retrospective.** And where such act allows to existing companies ample time in which to conform to its provisions before its penalties attach, it is not a retrospective law.

Vol 184 mo—11

8. ————: Title: **Object Clearly Expressed.** Where the title is a fair index to an act, the act can not be overthrown on the ground that its object is not clearly expressed in its title, even though there may be some matters of detail or administration or punishment specified in the body of the act that are not expressed in the title.

9. ————: **Police Power: For What Purposes Exercised: Right to Contract.** In the exercise of its police power the State may enact any law that is designed to suppress or punish a wrong, to mitigate an evil, to preserve the peace, health, morals, good order and general welfare of the community. No person has an absolute right to engage in any business which contravenes these purposes.

10. ————: ————: **Public Business.** It is not necessary in order that the State may exercise its police powers to regulate a business, that the business be such as to have a public interest impressed on it. A police regulation does not rest upon such a fact, but on the fact that it is intended to suppress a wrong, to mitigate an evil or to conserve the general welfare of the community.

11. ————: **Business Pursuits: Arbitrary Classification.** A law that applies alike to all persons or companies engaging in a business attempted to be regulated by the act, is not in violation of the fourteenth amendment of the United States Constitution as arbitrary classification.

12. ————: **Right to Contract.** The right every man has to contract is limited by the consideration that the contract must be an honest one and a legal one. The State has the right to prohibit a swindling contract, and to require any company to so conduct its business that citizens dealing with it may not be swindled by it.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

Reversed and remanded (*with directions*).

*Edward C. Crow,* Attorney-General, *J. W. Suddath, Charles E. Morrow* and *C. D. Corum* for appellant.

(1) The respondent company is subject to and has violated the provisions of the act regulating co-

operative companies. Laws 1903, p. 110. (2) Before declaring an act of the Legislature void as conflicting with a constitutional provision the court must have no reasonable doubt on the subject; the doubt is to be resolved in favor of the law. State v. Able, 65 Mo. 357; Ewing v. Hoblitzelle, 85 Mo. 64; Kelley v. Meeks, 87 Mo. 396. (3) The business of persons and corporations may be regulated, for the public good, under the police power of a State. All property is held subject to those general regulations, which are necessary to the common good and general welfare. This does not impair the obligations of contracts. The obligation of contracts by no means extends so far. Cooley's Constitutional Limitations, secs. 572 to 579; Constitution, Mo. art. 11, sec. 5. (4) The title of the acts is sufficient. The penal section did not have to be mentioned in the title. It is only necessary that the title indicate the subject in a general way. State v. Whitaker, 160 Mo. 59; State v. Brostark, 136 Mo. 335; State ex rel. v. Bronson, 115 Mo. 271; State ex rel. v. Marion Co. Ct., 128 Mo. 427; De Both v. Rich Hill Coal Mining Co., 141 Mo. 497; Senn v. Railroad, 124 Mo. 627; Elting v. Hickman, 72 S. W. 700. (a) The fact that it is made a penalty to violate the act does not render the title bad which did not state the crime created. State v. Whitaker, 160 Mo. 59. (b) All auxiliary provisions properly attaching to the main subject, and constituting with it one whole, may be embraced within the enactment. State v. Whitaker, 160 Mo. 59. (c) The act does not contain two distinct subjects. It is all germane to the main subject. State v. Bixman, 162 Mo. 1; State v. Bennett, 102 Mo. 364. (5) No judicial or legislative powers are placed in an executive officer. State v. Hathaway, 115 Mo. 36; St. Louis v. Meyrose Lamp Mfg. Co., 139 Mo. 560. The provision is similar to the insurance statute, section 7979, Revised Statutes 1899. The supervisor

simply examines to see if the law has been complied with, before he issues a certificate. There is no question about the authority of the Legislature to pass the law. Daggs v. Ins. Co., 136 Mo. 382. (6) The act is not in violation of article 1, section 8, U. S. Constitution. The business regulated is not a transaction of "commerce." Daggs v. Ins. Co., 136 Mo. 382; Paul v. Virginia, 8 Wall. (U. S.) 168. Though police regulations may incidentally affect "commerce" carried on by citizens of different States, yet they are not an attempt to regulate commerce among the States. Wilson v. Railroad, 60 Mo. 184; Kenney v. Railroad, 62 Mo. 467; Gilman v. Railroad, 67 Mo. 323. (7) The Legislature may provide for winding up insolvent corporations although their original charter reserved no power in the Legislature to alter same. 4 Thompson on Corps., p. 4104, sec. 5392; Railroad v. Ballard, 2 Met. (Ky.) 165; Ward v. Farrell, 97 Ill. 593; State v. Am. Savs. & L. Assn., 67 N. W. 1. (8) Under article 12, section 5, State Constitution, the Legislature has the right to make new police regulations. Matthews v. Railroad, 121 Mo. 312, 165 U. S. 20; Cooley on Const. Lim. (6 Ed.), sec. 577, p. 707; Ward v. Farrell, 97 Ill. 593. (a) The Legislature has a general right to supervise and superintend the acts of corporations and to make such reasonable regulations as the public may require. This doctrine has been applied to the business of banks, insurance companies, lotteries, railroad companies, street railroads, and turnpike companies. Inasmuch as the regulations here sought to be established are identical with those of insurance companies, we only cite authorities applicable to insurance companies. 8 Cyc. 971; Word v. Ins. Co., 112 Ga. 585; Atty.-Gen. v. Looker, 11 Mich. 898; People v. Ins. Co., 19 Mich. 392; State v. Matthews, 44 Mo. 523; Price v. Ins. Co., 3 Mo. App. 262; Grobe v. Ins. Co., 169 N. Y. 613; State v. Ins. Co., 50 Ohio St. 252; s. c. (affirmed), 133 U. S. 446; Com. v. Mut. Ben. Assn., 10 Phila. 554; Ins. Co. v. Levy, 12 Tex. Civ. App. 45; Ins.

Co. v. Levy, 33 S. W. 996; Ins. Co. v. Ohio, 153 U. S. 466; Ins. Co. v. Meedles, 113 U. S. 574; Dupuy v. Ins. Co., 63 Fed. 680. (b) "Police power is the name given to that inherent sovereignty which it is the right and duty of the government or its agents to exercise, whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advanced civilization of a high complex character requires." 8 Cyc. 863. (c) "The power of the Legislature to subserve the general welfare of the people by all needful and proper regulations, in the interest of health and safety, is inherent in the sovereignty of the State and can not be bartered away by contract or otherwise." Boston Beer Co. v. Mass., 97 U. S. 25; New Orleans Gas. L. Co. v. Mfg. Co., 115 U. S. 650; Birmingham Min. R. Co. v. Parsons, 100 Ala. 662; Railroad v. State, 47 Neb. 549; Thorpe v. Railroad, 27 Vt. (1 Williams) 140. (d) "The power of prescribing general police regulations is resident in the Legislature, and inalienable even by express grant." Boston Beef Co. v. Mass., 97 U. S. 25; Thorpe v. Railroad, 27 Vt. (1 Williams) 140. (e) The exercise of police regulations does not impair the obligations of contracts, and does not violate the Constitution. A corporation must submit to proper police regulations in the interest of society even though such regulations operate to injure the business authorized by its charter and diminish the value of its property. 8 Cyc. 974, 975; Fert. Co. v. Hyde Park, 97 U. S. 659; Cantini v. Tillman, 54 Fed. 969; Barlow v. Bregory, 31 Conn. 261; People v. Hawley, 3 Mich. 330; State v. Paul, 5 R. I. 185. (f) The plaintiff's contention is that the Act of 1903 is authorized by the police power of the State. "All natural persons within the State and all corporations doing business within the State or created thereby, hold their property and engage in their business subject to the police power of the State." Am. Union

Tel. Co. v. West. Union Tel. Co., 67 Ala. 26; North-western Fer. Co. v. Hyde Park, 70 Ill. 634; Singer v. State, 72 Md. 464; State v. Gardner, 58 Ohio St. 599; Dent v. W. Va., 129 U. S. 112; Minneapolis, etc. Co. v. Beckwith, 129 U. S. 26; Powell v. Penn, 172 U. S. 678; Mugler v. Kansas, 123 U. S. 623. (9) The act in question is not local or special; it does not discriminate against persons of the same class, nor does it deny the equal protection of the law. Commonwealth v. Vrooman, 30 Atl. 217; State v. Stone, 118 Mo. 388; Cravens v. Ins. Co., 148 Mo. 614; People v. Gay, 30 L. R. A. 464; State ex rel. v. Woodman, 11 L. R. A. 420; Austin v. State, 10 Mo. 591; State v. Hathaway, 115 Mo. 36; Masonic Aid Ass'n v. Wadill, 138 Mo. 628; Powell v. Sherwood, 162 Mo. 605; Haynie v. Knights Templars & Masons Indm. Co., 139 Mo. 416; Cooley, Const. Lim. (3 Ed.), 390. (10) The appointment of a receiver does not take property without due process of law. 20 Am. and Eng. Enc. Law (1 Ed.), 18.

*Dwight P. Dilworth* and *Harkless, Crysler & Histed* for respondents.

(1) The Act of 1903 applies alike to individuals, partnerships and corporations. (2) It singles out and makes an arbitrary distinction between contracts which shall come within the statute, from those beyond its scope without any reasonable basis for such distinction. (3) It likewise discriminates between those employing identically the same kind of contracts in their business, bringing one class within the statute and excluding the other from its operation. (4) It requires a deposit of $25,000 with the Treasurer of the State at the outset, and additions to such deposit to keep pace with liabilities. Such deposits must be from funds other than those derived from payments by the contract holders, notwithstanding that in many cases such

payments constitute the only source of revenue. It thus imposes the burden not only of making the particular business profitable and of safely keeping and conserving the income derived therefrom, but of conducting and earning from an independent business enough money to keep this deposit up to the limit. (5) There is thus required to be constantly kept on hand $2 in cash for every $1 of liability, no matter how remote in point of time the maturity of such liability may be or dependent upon what contingencies. Of this fund one dollar at least must be accumulated from some source other than that derived from the operation of the business itself. (6) There must likewise be filed with the Supervisor of Building and Loan Associations a detailed variety of information and data. (7) There must be submitted to the Supervisor an itemized statement of the plans for doing business, together with all forms of contracts or agreements proposed to be used in connection therewith. The Supervisor, through the negative power of rejecting contracts and plans submitted, is in practical effect given the right to prescribe the plans and details and the contracts under which alone the business may be transacted at all. (8) The Supervisor is vested with an absolute and unrestricted power in prescribing the method of business and the terms of contracts which may be used; discretionary in its nature and hence not reviewable by any court. No right of review of the actions of the Supervisor in that behalf is given to the courts by the statute. (9) The function of the Supervisor is both legislative and judicial. (10) There is also to be read into any contracts which may be issued the provisions of sections 4 and 5. The effect of these sections is to fix the term of maturity of contract, dependent solely upon the election of the other party; of establishing the cash value of such contracts which must be paid to the withdrawing member without regard to the terms of his engagement or his status as to being delinquent for fines, penalties or

otherwise, and without regard to the corresponding rights which other members of the same class may have in the common fund under their contracts as a reward for persistent and faithful compliance. The power of making the contracts forfeitable for non-payment is taken away. No allowance is made for expense of management; so that the business, if conducted at all, must be at a loss either actual or potential, depending wholly upon the will and pleasure of the adverse parties to the contract. These sections 4 and 5 are repugnant to and inconsistent with section 1, and render the transaction of business which might be authorized by section 1 an impossibility. (11) No corresponding benefit or advantage is secured to the person doing this business in compensation for the benefits and advantages given by the statutes to those with whom he shall do business. (12) The net result of the statute as a whole is to utterly deprive the individual, copartnership or corporations transacting this kind of business of the right of private contract at all in connection therewith. The contracts which he can employ are only those which are made for him, so far as all material features are concerned, by the Supervisor of Building and Loan Associations and the statute. (13) No distinction is made between corporations engaged in business before the passage of the act and possessing charter powers to transact such business, and those corporations which may be formed after the passage of the act. (14) No distinction is made between the right to transact and complete business initiated and in course of performance before the statute, and the right to commence and carry on business after the act. The completion of contracts and conclusion of business entered into before the statute are equally dependent upon performance with the conditions prescribed. (15) The transaction of business, new or old, in violation of the statute is denounced as a misdemeanor, punishable by a fine of not less than $100 for each offense. (16) A receiver shall the appointed for

the following reasons: (a) Failing to comply with any of the provisions of the act. (b) Insolvency. (c) Inability to continue in business to the benefit and profit of creditors. (d) Inability to continue in business to the benefit and profit of contract holders. (e) Failing or refusing (no matter how good the reason for such failure or refusal may be and notwithstanding the terms of the contract in that behalf) to pay withdrawals for sixty days, which means the withdrawals provided by sections 4 and 5. In the nature of things the Supervisor is, and must be, the sole judge of a number of these grounds because they relate to matters over which he is given the absolute right of control in his discretion. For any of these grounds, the appointment of a receiver is mandatory upon the court. The function of the court and its jurisdiction throughout are purely administrative in character. (17) The classes of business attempted to be regulated by this statute are not "affected with a public interest," and are not, therefore, subject to the police power of the State to which alone the right of regulation is referable.

MARSHALL, J.—This is a proceeding under the act of April 21, 1903 (Laws 1903, p. 110), by the Supervisor of Building and Loan Associations, to wind up the affairs of the defendant company, for the appointment of a receiver, and for an injunction. The trial court entered a decree for the defendants and the plaintiff appealed.

The allegations of the petition are: That the relator is the Supervisor of Building and Loan Associations; that the defendant company is a domestic corporation, organized under article 9 of chapter 12, Revised Statutes 1899, for the purpose of buying and selling watches, clocks, diamonds, jewelry, precious stones, and any and all other kinds of merchandise, all for pecuniary profit and gain; that the defendant company is engaged in issuing contracts to citizens of this and other

states which shall be redeemed or fulfilled by the accumulation of the funds arising from the contributions made by the holders of such contracts; that the contracts are to mature and be fulfilled in the order of their issue; that by said contract the company agrees to give to the holders of such contracts commercial, white, flawless diamonds, represented by defendant to be greater in value than the amount paid in upon said contracts, together with the actual net earnings accumulated thereon; that the issue of such contracts is unauthorized in law or by the charter of the company; that in order to lawfully issue such contracts (under the act aforesaid), it was necessary for the company, as a condition precedent to doing business, to deposit with the State Treasurer in cash or bonds of the character specified in the act, the sum of $25,000, and to file with the Supervisor of Building and Loan Associations a certificate of the State Treasurer, showing such deposit, and also to file a certified copy of its articles of incorporation, its by-laws, and a detailed statement of its plan of business, together with copies of all contracts proposed to be used in the conduct of its business; that the defendant company has failed to comply with all these prerequisites; that the defendant company is engaged in issuing such contracts contrary to law, and is insolvent and is unable to pay off all the debts due to its creditors and is unable to pay to the holders of such contracts the amounts paid thereon with three per cent interest, and has refused to pay the withdrawals to the parties entitled thereto, although the same have been demanded in writing and thirty days' notice thereof given, and has been unable to pay the same for a period of more than sixty days after demand in writing therefor; that the defendant company is not carrying out the purposes and objects for which it was incorporated, and is conducting its operations to the detriment and prejudice of the people with whom it does business; that the company and its officers and its managers have diverted the

funds of the contract holders from lawful channels and have converted them to their own use, thus rendering the company unable to pay the cancellation value of such contracts; and that said officers have deposited such money in their own names in the defendant bank. The prayer of the petition is for a decree winding up the affairs of the company, appointing a receiver, and for an injunction restraining the company and its officers from further prosecuting said business and restraining such company and its officers and such bank from disposing of such money and ordering said money, and the books, papers, and other property to be turned over to the receiver, and for general relief.

Upon the filing of the petition the circuit court granted a temporary injunction, and dissolved it upon final hearing, but it was reinstated by this court pending the appeal.

The answer of the defendant admits the official character of the relator, and that it is a domestic corporation, with a capital of $10,000, and has its principal office and place of business in Kansas City, and then denies generally all the other allegations in the petition. The answer then pleads specially that the sole right of the relator to maintain this action arises out of the act of 1903, and then says that said act is unconstitutional and void, because it violates the following sections of the Federal and State Constitutions, to-wit: First, section 8 of article 1, of the Constitution of the United States, in that, it interferes with interstate commerce; second, section 28 of article 4, of the State Constitution, in that, the act contains more than one subject and the title of the act does not clearly express the subjects or objects of the act; third, article 3 of the State Constitution, in that, it vests judicial and legislative powers upon the Supervisor of Building and Loan Associations, by permitting him to prescribe the kind of contracts such companies may use; fourth, section 30 of article 2 of the State Constitution, and section 1 of the 14th amendment

to the Constitution of the United States, in that, it deprives such companies of their property and destroys their business without due process of law; fifth, section 15 of article 2 of the State Constitution, and section 10 of article 1 of the Constitution of the United States, in that, it impairs the obligation of a contract and is retrospective in its operation.

The reply is a general denial.

The case was tried upon an agreed statement of facts which showed that the defendant company had never complied in any way with the act of 1903; that it issued contracts of the character named; that it was unable to pay the holders of the outstanding contracts the withdrawal value thereof after thirty days' written demand therefor; that the only business the defendant company engaged in was the selling of diamonds by contracts of the character charged; that the contracts aforesaid were all similar to and were in the following form:

Number 1989.

United States of America.

Organized Under the Laws of Missouri.

THE PREFERRED TONTINE MERCANTILE COMPANY,
Kansas City, U. S. A.

Diamond Contract.

This contract is one of the series of like contracts issued during the week in which this is dated.

Know all men by these presents, That if Mrs. C. H. Broughton, the holder hereof, shall first well and truly make each and all the payments herein provided for; to be made by the holder hereof at the times and in the manner herein specified, time, manner and the amount of payment being of the essence hereof, The Preferred Tontine Mercantile Company, of Kansas City, U. S. A., will deliver to the holder hereof or estate under and according to the terms and conditions and in the manner and order hereinafter set forth, commercial white, clear and flawless diamonds, of the weight of two carats, and of the value of one hundred dollars per carat.

The holder hereof promises and agrees to pay to the company, at its home office in the city of Kansas City, U. S. A., the full sum of ONE HUNDRED AND TEN DOLLARS in the following manner, to-wit: Five dollars on the delivery hereof, the receipt of which

is hereby acknowledged, and one dollar and twenty-five cents on or before the last day of each calendar week following the date thereof until $110 is paid. If the holder hereof shall fail to pay any of the said installments within the week in which it is payable, the said delinquent installment, together with the additional sum of twenty-five cents may be paid at any time before the end of the next succeeding fourth calendar week; but if the holder hereof should fail or neglect to pay any of the said weekly installments at the time and in the manner herein provided, and shall continue in such default for more than four consecutive weeks, then and in that event, this contract shall, because of said default, become and be wholly null and void, and all the payments theretofore made hereon shall be forfeited.

The weekly installments having been paid hereon to and inclusive of $110 this contract shall be deemed fully paid up and nonforfeitable, and the holder shall be entitled to receive the diamonds herein described, provided, however, that if at such time, the amount in the hands of the company to the credit of this contract is not equal to the sum of $200 heretofore provided, then the diamonds shall not be delivered until the amount to the credit thereof shall equal that sum.

The company shall employ of each weekly installment paid in on this and other contracts, of the series to which this contract belongs (exclusive of the first four), one dollar, together with the lapses, fines and interest accruing thereunder, in the purchase and delivery of the diamonds required for the performance of such contracts; ten cents shall be applied to a contingent fund; and fifteen cents, together with all other sums, to defray the cost of managing the business. This contract is transferable, but no transfer will be recognized by the company unless first registered by the company, for which registration a fee of one dollar will be charged.

The holder of this contract shall be entitled to the benefits hereinafter specified.

First. At the expiration of said term of eighty-four weeks when the amount of money actually credited to said contract, together with its pro rata share of accrued earnings, as provided herein, equals the face value thereof, a two carat commercial white and flawless diamond shall be delivered.

Second. The time of said delivery shall be accelerated when the weekly installments paid on this contract and its pro rata share of the net earnings equals its face value.

Third. Contracts shall be redeemed in the order of issue beginning with the oldest outstanding unpaid contract.

The payments upon this contract are payable at the home office of the Preferred Tontine Mercantile Company, unless the holder is otherwise notified. No further notice of payments falling due will be given, neither is it permitted for collectors to make personal calls to collect.

In Witness Whereof, The Preferred Tontine Mercantile Company has caused this contract to be signed by the president and secretary and its corporate seal to be hereunto attached, this 7th day of September, A. D. 1901.

G. E. STILLINGS, President.

GUY C. STILLINGS, Secretary.

Preferred Tontine Mercantile Co., Kansas City, Mo.

(Seal)   1900.

The agreed statement further showed the fact to be that during the three years the defendant company had been engaged in such business it issued statements of the character and extent of its business, among which was the statement of August, 1903, which stated that it had disbursed $237,783.15 in satisfaction of diamond contracts in less than three years, and which also contained the statement that the contracts written by the company between December 10, 1900, the day on which the first contract was sold, and August 31, 1903, the date of the statement, amounted to $899,490.

The statement also contained the following explanation of the plan upon which the business of the company was based:

### OUR PLAN EXPLAINED.

Briefly stated, this company's contract with its patrons is as follows: When you sign an application for a diamond contract you pay the agent or the company one, two, three, four, or five dollars down, whereupon an explicit contract is delivered to you by the company. This contract calls for an installment of one dollar per week until called for redemption and the contract holder agrees to surrender his contract any time upon the delivery of a commercial white and flawless diamond of the weight and value set out in maturity table endorsed on the back of the contract and made a part thereof for the week in which the redemption occurs. If you keep up these payments for the full one hundred and ten weeks and your contract has not been redeemed it then becomes fully paid up and non-forfeitable and when the contract is reached in the order of performance the company will deliver to you commercial white clear flawless diamonds at the rate and value of $100 per carat, for which a reliable jeweler will pay cash at the rate of $80 per carat.

All contracts whatsoever issued by any person or concern should either guarantee as to the amount or as to the time. In

State ex rei. v. Mercantile Company.

most cases, if not all, building and loan societies or companies guarantee as to the time of payment to their respective patrons, and estimate the amount which shall be due them.

In the plan of the diamond contract issued by this company, we reverse that order and make the amount the essence of our contract and the time is estimated.

To Illustrate: If you pay the one hundred and ten consecutive payments your contract then becomes fully paid and non-forfeitable and you will be entitled to receive the diamond if reached in the order of performance at that time. But should the period of maturity exceed one hundred and ten weeks, or run over, as the common expression is, you will be to no expense of further payment of installments, but will be holding practically what an insurance company would term a paid-up policy. In their companies the policy would be payable to your beneficiary at your death, in which case time is also estimated and is termed "your period of expectancy of life." You may die much earlier than that period, or you may live long after it, but the "law of average" protects the company or association in its estimate. In our case the amount would be payable to you when yours becomes oldest outstanding contract. The period of maturity will not remain steadily at any given point, as the volume of new business and amount of lapses are subject to the same fluctuations that surround any ordinary business enterprise, but the law of average fully protects you against an unreasonable length of time and guarantees perpetuity of the business.

The company does not invest the money paid in as installments and has no liabilities further than to receive the money, place eighty cents of each dollar installment paid in into the redemption account to redeem the oldest outstanding contract, which is promptly called in and cancelled as often as there is paid to the company enough of said weekly installments to provide for such redemption.

The statement also contained a "weekly maturity table," which showed that after the fifth week's payment the holder of the contract would be entitled to a diamond of certain weight and value and that the profit on the contract would be a certain stated amount. The result of the payment for one hundred and ten weeks being that such holder would be entitled to a diamond weighing two carats, which would be of the value of one hundred and sixty dollars, and that the profit to the holder of the contract would be fifty dollars. Other facts appeared, but it is unnecessary to set them out here, as what is here stated is decisive of the case.

## I.

The scheme of the defendant company is this: it entered into contracts with third parties that if they would pay one dollar a week for one hundred and ten weeks, it would give them a commercial, white, clear, flawless diamond, weighing two carats, for which any reliable jeweler would pay one hundred and sixty dollars in cash. The company did not invest the money paid in, but it promised to place eighty cents on each dollar paid in, into a redemption account and out of that account to redeem the oldest outstanding contract as soon as there was money in the redemption account to do so, and thus to continue thereafter.

There is no denial that the business done by the company is such as brings the company within the provisions of the act of 1903, nor does the defendant deny that it has failed and refused to comply with the provisions of that act; nor does it claim that it is able or willing to comply with that act. The defendant also admits that the Broughton contract herein set out was fully paid up on April 11, 1903, and that on May 9th the holder demanded payment thereunder, and that its only answer to the demand was that it was paying up its contracts some four months after they became fully paid-up contracts, and that it estimated that it would pay the Broughton contract four months after the last payment by the holder to the company of the last installment.

The scheme on its face is such a palpable confidence game that the wonder is that any persons could be found to be so ignorant as to go into it. Everyone is required to pay one hundred and ten dollars. After this, the company appropriated to its own use twenty per cent, or twenty-two dollars, and placed the remaining eighty-eight dollars in the redemption account. The company then promised to give the holder of the contract, a diamond, weighing two carats, at the rate and value of one

hundred dollars a carat, for which any reliable jeweler would pay in cash at the rate of eighty dollars a carat. Thus the profit to the holder would amount to fifty dollars.

Of course it is plain that with only eighty-eight dollars placed in the redemption account, the company could not give the holder a diamond, for which any jeweler would pay one hundred and sixty dollars. But right here is one of the tricks of the plan. The defendant did not promise to give the holder the diamond as soon as he had finished making his one hundred and ten payments. On the contrary the promise was to redeem the oldest outstanding contract whenever there is paid to the company enough of said weekly installments to provide for such redemption. Or otherwise stated, whenever there was enough money in the redemption account to do so.

Under this scheme the company would be short seventy-two dollars of enough money to pay each contract; that is, the holder paid in one hundred and ten dollars, of which the company took twenty-two dollars to pay expenses, and put only eighty-eight dollars in the redemption fund. Therefore seventy-two dollars must be gotten from somewhere to add to the eighty-eight dollars to make up one hundred and sixty dollars (or the diamond worth that amount) which the company promised to give the holder. None of the money was invested, and, therefore, no interest was earned. The seventy-two dollars deficit, therefore, had to come out of the money paid in by the other holders, every time a contract was redeemed. In other words the company went into debt seventy-two dollars every time it redeemed a contract. It is not shown that any amount was earned from forfeitures.

If it redeemed $237,783.15 in three years (it is not explained how the odd dollars and cents could come into such a scheme) as it says it did, it must have redeemed, in round numbers, about fourteen hundred and eighty-

three contracts, and if it lost seventy-two dollars on each contract redeemed, it must have lost in three years, in round numbers, one hundred and six thousand, seven hundred and seventy-six dollars. The defendants' entire capital stock was only $10,000. Upon this showing, it appears that the defendants' capital is all gone, and in addition about ninety-seven thousand dollars of the money paid in by the contract holders have been used to redeem contracts.

The result is that the company is hopelessly insolvent, and will grow more so every day it does business.

It is not surprising therefore that the company never attempted to obtain the sanction of the State or of any of its officers to engage in such a scheme.

Its articles of incorporation give no intimation of an intention to engage in such a game, and afford no authority whatever for such practices. It is not to be wondered at, therefore, that the defendant has not put up $25,000 as security for its contracts as the act requires, nor that it has not increased that deposit when the original deposit was exhausted, for if the defendants' statement aforesaid is correct, it would require the defendant to deposit now $651,706.85, the difference between the contracts written, $889,490, and the contracts redeemed, $237,783.15.

The defendants' counsel were, therefore, wise to place the defense of this case upon the law and not upon upon the facts.

## II.

The remaining question is whether the act of 1903 is unconstitutional for any of the reasons set out in the defendants' answer.

These constitutional objections are that the act violates the interstate commerce law; that the act contains more than one subject, which is not clearly expressed in the title to the act; that the act confers legislative and judicial powers upon the Supervisor of Building and

Loan Associations; that it takes defendants' property without due process of law and that it impairs the obligation of a contract and is retrospective.

This necessitates a short review of the act. The title of the act is as follows:

"An act to regulate the business of all persons, copartnerships, associations, organizations or corporations which are now or shall hereafter be engaged in business as home co-operative companies or in the business of issuing contracts or agreements, whether in the nature of a bond, debenture, certificate or otherwise, providing for the redemption or fulfilling of such contracts or agreements by an accumulation of a fund or funds from the contributions made by the subscribers to or the holders of such contracts or agreements; or providing for the maturing or fulfilling of such contracts or agreements in the order of their issue or in some other fixed or arbitrarily determined order; or providing for the payment of moneys or the granting or giving of any consideration greater in value than the amount paid in on such contracts, together with the actual net earnings accrued and accumulated thereon; or providing for the loaning of the funds contributed by the subscribers to or the holders of such contracts or agreements to such subscribers or holders in any fixed or arbitrarily determined order or manner; or for the making of loans or advances from such funds to or for such subscribers or holders to be repaid in installments, except all persons, copartnerships, associations, organizations or corporations doing business under the provisions of the statutes provided for the regulation of bond investment, trust, or insurance companies, or banks, saving fund, building and loan, fiduciary, relief or fraternal orders, associations or companies; with an emergency clause."

The first section of the act requires that all persons or companies now engaged or that may hereafter engage in issuing contracts and providing for the redemp-

tion or fulfilling thereof by the accumulation of a fund from contributions by the holders of such contracts, or providing for the maturing or fulfilling of such contracts in the order of their issue or in some other fixed or arbitrarily determined manner; or providing for paying money or giving property represented to be of greater value than the amount paid under such contract, with the net earnings added; or providing for the loaning of funds contributed by the holders of such contracts in any fixed or arbitrarily determined order or manner; or for making loans to such subscribers from such funds to be repaid in installments; shall for the protection of the subscribers or holders of such contracts deposit with the State Treasurer $25,000 in cash or in bonds of the character specified in the act, and whenever the liability upon such contracts shall equal such deposit, the company shall make an additional deposit sufficient to cover such excess; provided that no part of the original deposit of $25,000 shall consist of any funds contributed by such subscribers.

Section two of the act requires existing companies to comply with the act within thirty days, and new companies to do so before commencing business, by filing with the Supervisor of Building and Loan Associations a certificate of the State Treasurer, showing that the deposit has been made, and by filing with him a certified copy of the articles of incorporation, and of the by-laws, and a detailed statement of the plan of doing business, with copies of all contracts proposed to be used, and to procure a license from the Supervisor authorizing him or it to do business, and prohibiting any change in such contracts or plans until they are submitted to and approved by the Supervisor. Section three makes a violation of the act a misdemeanor. Section four makes the contracts non-forfeitable, but provides that in default of payments for six months, the contracts may be cancelled and the holder shall be credited with

all payments, less ten per cent, which shall be paid him upon demand and surrender of his contract.

Section five permits withdrawals upon thirty days' notice of the amount paid in, less ten per cent, if withdrawn before the expiration of one year, or of the amount paid in, less five per cent, if withdrawn after the expiration of one year and before the expiration of two years, and less three per cent if withdrawn after two years.

Section six makes the Supervisor of Building and Loan Associations ex-officio supervisor of such business, with visitorial powers.

Section seven makes the liability upon such contracts the amount paid in, with three per cent added, and provides that whenever such company shall be unable to pay all debts due to creditors and to pay to holders of such contracts the amount paid thereon, with three per cent, it shall be deemed to be insolvent.

Section eight requires that whenever any company fails to comply with the law or becomes insolvent, or fails to pay withdrawals for a period of sixty days after demand therefor, the Supervisor shall bring an action to have himself appointed receiver as is provided for winding up and dissolving building and loan associations, and it is made the duty of the receiver to take charge of the affairs of the company and to wind them up.

Section nine provides that such suit shall be conducted in the name of the State of Missouri at the relation of the Supervisor, and that the Attorney-General and the attorneys selected by the Supervisor shall conduct the suit, and the receiver and the attorneys selected by him shall be paid for their services out of the assets administered upon, upon an order or allowance by the court.

Section ten exempts banks, savings fund, trust companies, insurance companies, building and loan, bond investment, fiduciary, relief or fraternal orders,

associations or companies, from the operation of the act.

Section eleven is the emergency clause, and recites that the fact that there are persons, corporations, etc., engaged in the business to be regulated by the act, without control or restraint of law to the injury and hurt of the citizens of the State, creates an emergency, etc.

It is not necessary to follow counsel through all the points contained in their able and exhaustive brief. The case at bar is very simple and lies within a very small compass. The defendant is a domestic corporation, and so far as it appears is not engaged in interstate commerce in any respect whatever. The act in question does not pretend to and does not on its face have any reference whatever to interstate commerce. Therefore, nothing further need be said of the constitutional objction to the act on the ground that it violates section 1 of article 8 of the Federal Constitution.

It is likewise apparent, from a mere reading of the act, that it does not confer either legislative or judicial powers upon the supervisor, and, therefore, it does not offend against article 3 of the Constitution. It requires every such company to file a certified copy of its articles of incorporation, and its by-laws, and a statement of its plan of business and the form of the contracts it proposes to use, with the Supervisor, and requires him to issue a certificate to do business if the company has complied with the act, and prohibits any change in the contract without the approval of the Supervisor. But such provisions do not make the act unconstitutional. An act requiring a uniform form of policy of insurance to be approved by the Superintendent of Insurance was held to be constitutional in Business Men's League v. Waddill, 143 Mo. 495, and the powers conferred upon the Supervisor by this act are no greater than those conferred upon the Superintendent by that act, or upon the Secretary of State in respect to ordi-

nary corporations.    In all other respects the Supervisor only acts by instituting a suit in court against the offender, and thereafter all the steps taken are by the court.    [See, also, Daggs v. Insurance Co., 136 Mo. 382; St. Louis v. Meyrose Lamp Mfg. Co., 139 Mo. 560.]

For like reasons there is no merit in the point that the act deprives the defendant of its property without due process of law.    No right is taken away from the defendant except as the result of a judgment of a court of competent jurisdiction, after notice and hearing. The fact that the receiver and his attorney are paid out of the assets administered upon, does not constitute the taking of the defendants' property without due process of law.    Such allowances have ever been made in cases of receivership, and are properly made, for otherwise the court would be helpless to enforce its decrees.    They are allowable as part of the costs of the administration, and as the defendants' wrong made the administration necessary, it is right to charge the costs of administration against it.

The act does not impair the obligation of any contract nor is it retrospective.    Its purposes are to secure to the citizens of this State protection against the breach of its contracts by the companies engaged in such business, and it allows existing companies ample time to conform to the law before its penalties attach, and therefore it is not retrospective.

The act is single.    Its sole object and purpose was to protect the citizens of this State from being swindled by such schemes as the defendant is engaged in, by requiring a deposit to cover their investments.    The purpose of the act is to promote honesty, fair dealing, and the safety of investments.    The title of the act is a fair index to the act.    The matters not specified in the title are mere matters of detail or administration or punishment, and are therefore sufficiently covered by the title. [State v. Whitaker, 160 Mo. 59; State v. Bixman, 162 Mo. 1; Lynch v. Murphy, 119 Mo. 163.]

The principal contentions of the defendant, however, are, that the act is not within the police power of the State; that it violates the equality clause of the Federal Constitution, and that it limits the right of the defendant to contract and establishes an arbitrary classification and, therefore, offends against the 14th amendment to the Federal Constitution.

In the exercise of its police power the State may pass any law which is designed to suppress or punish a wrong, to mitigate an evil, to preserve the peace, health, morals, good order and general welfare of the community. For no person has an absolute right to engage in any business which contravenes these purposes. Time and space forbid any extended enumeration of the many instances in which laws having such objects in view have been held to be within the police power of a State. A few will serve to point the rule.

In St. Louis v. Knox, 6 Mo. App. 247, s. c., 74 Mo. 79, an ordinance of the city requiring persons who desire to engage in the business of horse-trading to procure a license so to do, and providing that no such license shall be issued unless the board of police commissioners certify that the applicant is a person of good moral character, was held to be within the police power and therefore valid.

In State v. Hathaway, 115 Mo. 36, an act prohibiting the practicing of medicine without a license was held to be within the police power and valid.

In St. Louis v. Meyrose, etc. Co., 139 Mo. 560, an ordinance prohibiting the employment of any one to run a steam boiler unless such person was a licensed engineer, was held to be within the police power and valid.

In Daggs v. Insurance Co., 136 Mo. 382, an act that prohibits an insurance company from denying that the property insured was worth the value specified in the policy was held to be within the police power and not to violate the 14th amendment to the Federal Constitution which prohibits a State to pass any law which shall

abridge the privileges or immunities of citizens of the United States.

In short, the statute books are full of regulations and restrictions throwing safeguards around the helpless against the sharp practices or overreaching of the avaricious and unscrupulous.   Laws regulating interest and usury; making the seller of chattels on condition return seventy-five per cent of the amount received in case default is made in the contract of purchase (sec. 3413, R. S. 1899); making life policies non-forfeitable after three payments and requiring a certain portion of the premiums paid to be applied to the purchase of extended insurance (Smith v. Insurance Company, 173 Mo. 329); making the sale of property fraudulent under specified circumstances (chapters 30 and 31, R. S. 1899); regulating pawnbrokers (chapter 139); regulating peddlers (chapter 140, R. S. 1899), and too many other laws for enumeration here, can be found upon the statutes, and have been held to be constitutional, and this, too, independent of the consideration whether the business is such as to have a public interest impressed upon it, as the defendant contends must be the case in order to make the law valid.   Such laws rest upon the other bases mentioned, to-wit, they are intended to suppress a wrong, to mitigate an evil and to conserve the general welfare of the community.

The defendant claims that the act violates the equality clause of the Federal Constitution, and that it limits the right of the defendant to contract and establishes an arbitrary classification and therefore offends against the 14th amendment to the Federal Constitution.

The act relates to all persons or companies who engage in the character of business sought to be regulated.   The persons so regulated constitute a class unto themselves, and have no relation to any other class of persons engaged in any other kind of business.   The persons in the class are treated alike.   The law is there-

fore equal and not class legislation. [Hayes v. Missouri, 120 U. S. 68; Andrus v. Insurance Ass'n, 168 Mo. l. c. 163, and cases cited.]

It is said, however, that it is class legislation, because banks, savings fund, trust companies, insurance companies, building and loan, bond investment, fiduciary, relief or fraternal orders, associations or companies are exempted from the operation of the act. Of this it is only necessary to say that such other companies are regulated by other acts which are quite as stringent as those contained in this act, and that they are engaged in a very different kind of business from that the defendant is doing and which this act was intended to regulate. The provisions of this act would be wholly inapplicable to such other companies.

The fact that the act limits the absolute right of the defendant to contract, even if it was true, which it is not, would not make the act invalid. In civilized society there is no such thing as an absolute right to do as one pleases. Certain acts are made criminal, by law; others are prohibited as being *mala in se* or *mala prohibita;* all acts are limited by the equal right of others to do as they see fit, which necessarily produces a modification upon the rights of both, for the exercise of both would be incompatible and impossible. So the right to contract is limited by the laws herein referred to as regulating many classes of business. The law favors the right of every man to freely make honest and legal contracts, but it prohibits any man to make swindling contracts, and punishes him in one way or another if he so does. The right every man has to contract is, therefore, limited by the consideration that the contract must be an honest one and a legal one and the right of the other party to expect such a contract must not be impaired.

As herein pointed out, the business the defendant is engaged in necessarily leads to bankruptcy under the plan adopted by the defendant, and according to its

statement the unwary have been deceived. The plan
is impossible of honest and successful operation. The
only certainties attached to the plan are, that the de-
fendant will retain twenty per cent of all money it re-
ceives, and that every time a contract is redeemed the
company will lose seventy-two dollars. The charter
issued to the defendant never authorized it to engage in
any such business. The company has failed to comply
with the law, has not lived up to its contracts, and ac-
cording to its own statements is wholly insolvent, and
will become more and more so all the time. It ought
to be put out of business and its affairs wound up.

The judgment of the circuit court is reversed and
the cause remanded with directions to the circuit court
to enter a decree as prayed and to appoint the relator
receiver of the company and to wind up its affairs.

*Robinson, C. J.,* and *Brace, Gantt, Burgess, Val-
liant* and *Fox, JJ.,* concur.