LEE S. BURRIDGE v. NEW YORK LIFE INSURANCE COMPANY, Appellant.

Division One, April 1, 1908.

1. **LIFE INSURANCE: Extended Insurance: Net Value: Things Deducted.** The sum that may be applied to the purchase of temporary or extended insurance upon default in premium-payment and the death of the insured, on policies issued prior to the act of 1903, is three-fourths of the net value of the policy, less, not all indebtedness, but "any notes or other evidences of indebtedness to the company, given on account of past premium payments on said policy"—not less such notes as may be given to secure a loan.

2. ——: ——: ——: ——: **Statute of 1903: Not Retrospective.** The statute of 1903, providing that there shall be deducted from the net value not only "any notes given on account of past premium payments on said policy issued to the insured," but also "any other evidence of indebtedness to the company," such as a note for a loan, is not retroactive, and does not apply to a policy issued in 1894 to an insured who died in 1901, and does not authorize the deduction of the amount of a loan on the policy from three-fourths of its net value, in arriving at the time for which the policy may be extended, or in determining whether or not the policy could be legally cancelled and forfeited on the failure to pay premiums and the interest on the loan on the policy as security.

3. ——: ——: **Loan: Independent Contract.** Where the loan and pledge were contemplated by the policy, they do not constitute a contract distinct and independent from the policy.

4. ———: ———: ———: **To Pay Premiums: Proof: Presump-tions.** Where the policy contains a provision that makes it a condition precedent to the granting of a loan that five annual premiums must be paid before any loan will be made, and the loan was made about the time the sixth annual premium be-came due, it will be presumed, in the absence of evidence to the contrary, that the loan was not used to pay past premiums to the company, and the burden of showing it was so used is on the company.

5. ———: ———: ———: ———: ———: **Statements by De-ceased.** Statements by a witness that he heard the insured say that the loan went to pay premiums, made after the loan agreement was consummated, is of no probative force in es-tablishing that they were so used.

6. ———: ———: ———: **Cancellation and Forreiture.** Neither at the time the policy is drawn and issued, nor by any supple-mental subsequent contract in legal effect an amendment to the policy, such as a loan contract and pledge, is it permissible to whittle away the non-forfeiture statute requiring the net value of the defaulted policy to be applied to extended insur-ance. [Following Smith v. Mutual Benefit Life Insurance Co., 173 Mo. 329.]

7. ———: ———: ———: ———: **Settlement: Estoppel.** Any attempted cancellation of the policy on failure to pay the premiums and interest due on a loan, to secure which the policy had been pledged, in accordance with the loan contract, and a sending of the balance due, in the estimation of the company, to the insured and the beneficiary, do not work a can-cellation of the policy or prevent the application of the net value to extended insurance, if neither the insured nor the beneficiary ever received that balance or agreed to accept it. The fact that the check representing the balance was mailed to the insured at his business office and was received there and re-mained there for one year after it was mailed and six months after his death, if he in fact never received it, does not establish a surrender of the policy "for a consideration adequate in the judgment of the legal holder thereof." The word "judgment" used in the statute implies conscious consent, and there can be no consent without the meeting of minds.

8. ———: ———: **Constitutional Statute.** The non-forfeiture in-surance statute is not unconstitutional as an impairment of the right of contract. When a foreign insurance company comes into this State to do business, it impliedly accepts the statute, and is bound by its burdens—burdens which it accepted when it received a license to write insurance in this State.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*Judson & Green* for appellant; *James H. McIntosh* of counsel.

(1) The assignment and delivery of the policy to the company was a pledge of the reserve value of the policy for payment of the loan, under a distinct and separate contract of pledge, valid and enforcible both under the laws of New York and Missouri, and the non-forfeiture provisions of the Missouri statutes are inapplicable. Secs. 7880-7882, R. S. 1899, recognizing and authorizing loans by insurance companies upon securities of policies; sec. 16, ch. 690, Laws of New York, 1892. (2) The case of Smith v. Mutual Benefit Life Ins. Co., 172 Mo. 329, which was the sole basis of the order for new trial, does not control this case, as that case must be limited to its special facts, and is clearly distinguished from the case at bar. Laws 1903, p. 208; Mutual Reserve Life Ins. Co. v. Roth. 122 Fed. 853. The Smith case is distinguished from the case at bar by the following facts: 1. There is here an independent contract of commercial pledge distinct from the policy. 2. The entire loan was made for the purpose of payment of premiums. 3. There was an actual settlement and payment to the insured constituting a surrender of the policy. (3) This case falls within the express exception to the non-forfeiture statute, as the policy was surrendered to the company for a consideration adequate in the judgment of the holder. R. S. 1899, sec. 7900. (4) The plaintiff is estopped from maintaining this action. The retention of the check with knowledge of the fact that it was for the balance of the surrender value of the policy,

was a waiver of any other payment, and an acceptance of the account. Story on Contracts, sec. 1004; 29 Am. and Eng. Ency. Law (2 Ed.), 1108; Williams v. Railroad, 153 Mo. 519. (5) The physical or mental condition of the insured is immaterial. Wheeler v. Ins. Co., 882 N. Y. 545; Klein v. Ins. Co., 104 U. S. 89; Ins. Co. v. Daily, 33 Kan. 606; Hawkshaw v. Supreme Lodge, 29 Fed. 223; Gaterman v. Ins. Co., 1 Mo. App. 300; 25 Cyc., 844. (6) The non-forfeiture provisions of the Missouri statutes do not prohibit loans of insurance companies to their policy holders secured by the reserve value of their policies, and no such prohibition can be implied therefrom. Statham v. Ins. Co., 93 U. S. 24; Smith v. Ins. Co., 64 Mo. 330; Relfe v. Ins. Co., 78 Mo. 594; Rumbold v. Penn. Mut. Life, 70 Mo. App. 715; Boettgen v. Iron Co., 136 Mo. 531; R. S. 1899, sec. 7880. (7) The non-forfeiture statutes must be read not only in connection with the other sections of the non-forfeiture act, but with the entire chapter on life insurance, and the legislative intent must be derived from the entire act. *A fortiori,* must this be done to avoid a construction which involves unjust and absurd consequences, making the statute so construed unconstitutional. Kane v. Railroad, 112 Mo. 34; Bingham v. Birmingham, 103 Mo. 345; Chouteau v. Railroad, 122 Mo. 375; Lamar Water & Elec. Light Co. v. Lamar, 128 Mo. 188, 140 Mo. 145. (8) If the statute relied on could be construed as making the policy loan agreement in this case void and unenforcible, the statute so construed would be unconstitutional both under the State and Federal Constitutions. Art. 2, sec. 4, Const. of Mo.; Const. of U. S., amd. 14; Const. of U. S., art. 1, sec. 10; State v. Loomis, 115 Mo. 307.

*Jones, Jones, Hocker & Davis* for respondent; *Wellman, Gooch & Smyth* of counsel.

(1) Under the undisputed facts the plaintiff was entitled to judgment. It was error to grant a nonsuit, and the error was properly corrected by setting aside the nonsuit. R. S. 1899, sec. 7897; Smith v. Insurance Co., 173 Mo. 333. (2) The company could not rightfully deduct the amount of the loan to the insured from three-fourths of the net value of the policy because the loan was not made "on account of past premium payments on the policy." No such showing was pleaded or proven by defendant, upon whom the burden of proof rested, and the physical facts preclude the possibility of any such showing. Smith v. Insurance Co., 173 Mo. 333. (3) The loan agreement was part of the contract of insurance. Lewis v. Ins. Co., 187 U. S. 335.

LAMM, J.—Defendant is a life insurance company incorporated in the State of New York. At the times in hand John H. Reifsnyder was a resident and citizen of Missouri and so was his wife, Frances A. On February 20, 1894, defendant, as insurer, issued to John H. Reifsnyder, as the insured, a policy for five thousand dollars, naming his said wife as beneficiary. Her right was absolute, *i. e.*, the policy itself contained no provision permitting the insured to change the beneficiary. The application for it was made to defendant's St. Louis agent. The policy was delivered by him in St. Louis and the case proceeds on the theory that defendant was transacting a life insurance business in the State of Missouri under its laws in that behalf made and provided, that the policy is a Missouri contract, and, hence, the *lex loci contractus* governs. Reifsnyder died November 3, 1901. It stands admitted that payment of the policy was demanded, was refused, that defendant denied liability and that

by so doing it waived notice of proofs of death. Frances A. Reifsnyder on the 5th day of May, 1903, made a formal written assignment of her right, title and interest in the policy and of her right, claim, action and demands thereon to the plaintiff, who sues.

At the close of a trial before the Hon. Moses N. Sale, presiding judge of Division Two of the St. Louis Circuit Court, and a jury, a peremptory instruction was given for defendant. Thereat plaintiff excepted and asked a nonsuit with leave. One going, he presented in due season his motion to set it aside. This motion was allowed. Thereat defendant in turn excepted and appeals from the order granting a, new trial.

The suit was for the policy face less a certain policy loan made the insured. The recovery sought was thereby put below our jurisdiction. Jurisdiction, however, is conceded here because by answer there are lodged in the case constitutional questions.

No question is made on the pleadings and it will do to say on that behalf that they were sufficient to raise all questions made by learned counsel.

The controversy turns on a policy loan, a default in a premium payment, a default in paying the interest on the loan and an alleged surrender and cancellation of the policy under the terms of an alleged policy pledge made as collateral security for said loan. In a nutshell defendant's contention is that the policy with all its accumulations was pledged to it by the insured and the beneficiary to secure a policy loan; that under the terms of that pledge a default was made and the policy was cancelled to pay the loan, and surrendered. On the other hand, plaintiff (conceding the loan and default) contends that under the non-forfeiting clauses of the statutes of Missouri, then in force, the policy was alive at Reifsnyder's death and that defendant must pay the face of the policy less the loan.

In the determination of the case, the following record facts, agreements and statutes are involved, viz.:

Sec. 5856 (R. S. 1889): "No policies of insurance on life hereafter issued by any life insurance company authorized to do business in this State, on and after the first day of August, A. D. 1879, shall, after the payment upon it of two full annual premiums, be forfeited or become void by reason of the non-payment of premium thereon, but it shall be subject to the following rules of commutation, to-wit: The net value of the policy, when the premium becomes due and is not paid, shall be computed upon the American experience table of mortality, with four and one-half per cent interest per annum, and after deducting from three-fourths of such net value any notes or other indebtedness to the company, given on account of past premium payments on said policy issued to the insured, which indebtedness shall then be canceled, the balance shall be taken as a net single premium for temporary insurance for the full amount written in the policy, and the term for which such temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium and the assumption of mortality and interest aforesaid."

This statute in the Revision of 1899 is, so far as this controversy is concerned, substantially the same. It reads:

Sec. 7897 (R. S. 1899): "No policies of insurance on life hereafter issued by any life insurance company authorized to do business in this State, on and after the first day of August, A. D. 1879, shall, after payment upon it of three annual payments, be forfeited or become void, by reason of non-payment of premiums thereof, but it shall be subject to the following rules of commutation, to-wit: The net value of

the policy, when the premium becomes due, and is not paid, shall be computed upon the actuaries' or combined experience table of mortality, with four per cent interest per annum, and after deducting from three-fourths of such net value any notes or other evidence of indebtedness to the company, given on account of past premium payments on said policies, issued to the insured, which indebtedness shall be then canceled, the balance shall be taken as a net single premium for temporary insurance for the full amount written in the policy; and the term for which said temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium, and the assumption of mortality and interest aforesaid."

During the Forty-second General Assembly (Laws 1903, p. 208), section 7897, *supra,* was amended as follows:

"Section 1.  That section 7897, article 2, chapter 119, of the Revised Statutes of Missouri of 1899, be and the same is hereby amended by striking out the words 'any notes or other evidence of indebtedness to the company, given on account of past premium payments on said policies, issued to the insured, which indebtedness shall be then canceled,' in the tenth, eleventh and twelfth lines, and inserting in lieu thereof the words 'any notes given on account of past premium payments on said policy issued to the insured, and any other evidence of indebtedness to the company, which notes and indebtedness shall be then canceled,' so that said section, when amended, will read as follows:"  [Here follows section 7897 as amended, *q. v.*]

Section 7899 (R. S. 1899), provides that:  "If the death of the insured occur within the term of temporary insurance covered by the value of the policy as determined in section 7897, and if no condition of

the insurance other than the payment of premiums shall have been violated by the insured, the company shall be bound to pay the amount of the policy, the same as if there had been no default in the payment of premium, anything in the policy to the contrary notwithstanding.'' [Here follow provisos not material here.]

Section 7900 (R. S. 1899), points out certain cases to which the foregoing statutes shall not be applicable. The material one here is this: ''If the policy shall be surrendered to the company for a consideration adequate in the judgment of the legal holder thereof, then, . . . this article shall not be applicable.''

So much for the statutes.

The policy contained the following loan provision:

''The company will make advances as loans upon this policy at the fifth or any subsequent anniversary of the insurance, within the Accumulation Period, under the following conditions:

''First. That premiums are paid in full to the time when the loan is made, including the premium for the entire insurance year then beginning.

''Second. That the aggregate amount of loans outstanding from the sixth to the tenth years, inclusive, shall not exceed $1,400; from the eleventh to the fifteenth years, inclusive, shall not exceed $3,180; and from the sixteenth to the twentieth years, inclusive, shall not exceed $3,475.

''Third. That the policy shall be duly assigned to the company as collateral security for the loans, and deposited at the Home Office.

''Fourth. That interest at the rate of five per cent per annum shall be paid upon all such loans at the anniversary of the insurance next succeeding, and annually thereafter until the loans are paid off.

''Fifth. That the loans shall be for such time as consider it, but he was not to be controlled by it, nor

the borrower may elect, not longer, however, than to the end of the Accumulation Period.

"(Any indebtedness to the Company, including any balance of the current year's premium remaining unpaid, will be deducted in any settlement of this policy or of any benefit thereunder.)"

After the policy had been in force for five years and six annual premiums had been paid by the insured there were borrowed from the company, in pursuance of the aforesaid policy provision, fourteen hundred dollars, evidenced by the following "policy loan agreement" (omitting signatures):

"An agreement made this 27th day of February, 1899, between the New York Life Insurance Company, party of the first part, and Frances A. Reifsnyder and John H. Reifsnyder, party of the second part,

"Whereas, said party of the first part has this day loaned to said party of the second part the sum of fourteen hundred dollars the receipt of which is hereby acknowledged, upon the pledge of Policy No. 591,221, and its accumulations, issued by said party of the first part on the life of John H. Reifsnyder.

"And whereas said party of the second part hereby pledges to and has deposited with said party of the first part, as collateral security for the repayment of said loan with interest, said policy and its accumulations;

"Now this agreement witnesseth that said parties, in consideration of the premises and of the mutual covenants hereinafter mentioned, hereby mutually covenant and agree as follows:

"1. That interest in advance at the rate of five per cent per annum shall be paid upon said loan from the date of said loan to the next anniversary of said policy, to-wit, the 14th day of February, 1900, and annually in advance thereafter, at the Home Office of said party of the first part.

"Note. Interest is payable in advance, but in case said loan is repaid or said policy cancelled under section 4, interest will be charged only to the date of repayment or of cancellation, and any excess paid will be refunded. The date of cancellation will be the day after the month of grace expires. In case of the death of the insured interest will be charged only to the date of the approval of death, and any excess paid will be refunded.

"2. That said party of the second part shall be at liberty to repay said loan with accrued interest, at any time.

"3. That the repayment of said loan, with accrued interest, shall, without further action, cancel and annul this agreement, and that thereupon the company will return said policy, duly released, to said party of the second part.

"4. That in the event of default in payment of said interest or of any premium on said policy, for one month after they shall respectively become due, said party of the first part, which is hereby irrevocably appointed attorney for that purpose, is hereby authorized at its option to cancel said policy and its accumulations, for the customary cash surrender value then allowed by said party of the first part for the surrender of policies of this class, said party of the first part in that case being liable to said party of the second part for the return of the balance only of said cash surrender value, after deducting said loan and accrued interest.

"5. That in the settlement of any claim or any benefit under said policy before said loan with accrued interest shall have been fully paid, said party of the first part shall be liable to said party of the second part for the return of the balance only of the proceeds of said policy after deducting said loan and accrued interest and any other indebtedness.

"6. That any notice under this agreement may be given either personally or by mailing it at the post-office addressed to the office or last known place of residence of said party of the second part, and that any notice so mailed shall be deemed to have been served on the day following the day it was deposited at said post-office.

"7. That all the conditions, limitations and requirements of said policy, except as herein expressly modified, remain in full force.

"In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first above written, in duplicate."

The policy premium-payment date was fixed at February 14th, in each year. The insured also paid his premium and interest for 1900 (making seven annual premium payments) but defaulted in paying both interest and premium on February 14, 1901, and this default continued until his death.

There is evidence that for a year prior to his death the insured was *non-compos,* was watched as one who had lost his mental reckoning and attended to no business. It seems that within the time allowed by the policy, to-wit, on the 4th day of June, 1901, he made (or was caused to make) an application to the company for the reinstatement of his policy, his brother living in the East furnishing the money. But a medical examination determined he was not an insurable risk at that time and thereupon the application was refused. On the heels of this refusal, defendant company undertook, by its check, to return the money advanced for the reinstatement, to-wit, $512.75 —said money having apparently laid in defendant's St. Louis office pending the result of the application. There are certain facts relating to the alleged return of this money and certain contentions made with reference to the same that do not affect the legal proposi-

tions in the case or touch the merits, as we see it; since it is not contended the policy was "reinstated" and purged of the default.

After the fact was ascertained that Reifsnyder was not an insurable risk at the time of his application for reinstatement, to-wit, on June 18, 1901, defendant company foreclosed its lien as pledgee of the policy which it then held and indorsed on the policy a memorandum of its surrender and cancellation for non-payment of the February, 1901, premium and interest. By its actuaries and other experts it undertook to determine the customary cash surrender value of the policy at that time, and did determine it at $1,649.42. It then deducted its loan and accrued interest from the aforesaid cash surrender value and found a balance of $243.59 in its hands due on the policy after cancellation as aforesaid. Thereupon on the 21st day of June, 1901, it drew its check for said sum, payable to the order of the insured and the beneficiary, and put the same in the mails accompanied by a letter addressed to John H. Reifsnyder, Room 406 Security Building, St. Louis, Missouri. At that time John H. Reifsnyder was at Pottstown, Pennsylvania, with his brother where he remained to within a month of his death. The letter containing that check apparently never reached him as addressee. The check itself apparently never came into his hands nor into the hands of the beneficiary, and was never cashed. Mr. Reifsnyder had been secretary of an annuity company having its office in Room 406, Security Building, St. Louis, Missouri, and usually got his mail there. For a year he had not been performing the duties of secretary on account of his mental affliction. At a certain time one Secor, his brother-in-law, was appointed his administrator. One year after the check was dated and six months after Reifsnyder's death it came into the possession of Mr. Secor from one Mesmer who, it

seems, was an officer of said annuity company and officed at Room 406, Security Building. Mr. Secor delivered it to Mr. Jones, plaintiff's attorney, and he tendered it at the trial to defendant, unindorsed and uncashed. Mesmer was not called as a witness by either party, and how he got possession of this check is dark. If speculation be indulged it presumably came into his hands in handling Mr. Reifsnyder's mail delivered at the office of the annuity company.

It is stipulated that the reserve or net value of the policy in suit, on the 14th day of February, 1901, according to the American Experience Tables of Mortality, was such a sum that if three-fourths of it be applied as a net single premium to the purchase of extended insurance it would, at the then age of the insured, extend the policy for the full amount written in it for a period far beyond Reifsnyder's death.

Any other facts necessary to the determination of material contentions in the case will appear in the opinion.

On this record did the court err in setting aside the nonsuit?

I. In this court, on March 20, 1903, there was handed down a decision in Smith v. Mutual Benefit Life Insurance Co., 173 Mo. 329. That case was considered first in Division and then in Banc. What was decided by it was decided after mature deliberation in the light of able briefs and argument. It hinged on the interpretation to be given to that clause of section 7897, *supra*, pointing out the rule for getting at the net value sum to be applied to the purchase of temporary or extended insurance on default in the fourth or any subsequent annual premium payment. Attending to that section as it read when the policy issued and when the insured died, it will be observed that the net value of the policy is to be computed. Then from three-fourths of such net value there is to be

taken away—what? All indebtedness? Not at all. There shall be taken away "any notes or other evidence of indebtedness to the company, *given on account of past premium payments on said policies.*" The residue, if any, then goes automatically to the purchase of temporary or extended insurance. In the Smith case there was a loan made on the strength of the reserve value of the policy. Part of the loan was on account of past premium payments, but part of it was for a present cash loan at large. If the whole of the loan was to be deducted from the net value, then there was no purchasing power left to the net value, and *ergo,* no extended insurance in the Smith case. But, on the other hand, if only that part of the loan made on account of past premium payments was to be deducted from the net value before the purchase of extended insurance then there was a residuum left to be applied under the statute to the purchase of such extended insurance, and, in that event, the policy was alive and the company liable. In that case, therefore, the scope and meaning of that clause of our nonforfeiting insurance statute was held in judgment in the stiffest sense and this court decided that the statute was mandatory; that the *character* of the indebtedness to be deducted from the net value before applying the residue to the purchase of temporary or extended insurance must be looked to and was limited by the clear words of the statute "to notes or other evidences of indebtedness to the company, given on account of past premium payments" on the policy issued to the insured; and did not include notes and evidences of indebtedness arising in other ways. It is not apparent, assuming the statute be constitutional, how, giving heed to the hornbook maxim, *expressio unius,* etc., any other conclusion could have been arrived at in reason. It was held furthermore, in effect, that such provisions of law evidenced a sound and just

governmental policy, and wrote into every policy of life insurance, coming within its purview, a mandate not to be abrogated in whole, or hedged about or lopped off in detail, by policy provisions, nor to be contracted away otherwise than as prescribed by statute.

Seven days after the decision in the Smith case, and presumably on account of it, the Forty-second General Assembly, then in session, amended section 7897, *supra* (Laws 1903, p. 208, *supra*). The significance of the amendment can be seen at a glance in section 1 of that act hereinbefore set forth. It struck from the body of the law the statutory restriction upon the character of the notes and other evidence of indebtedness to be deducted from the net value before applying it to the purchase of temporary insurance and in it wrote in lieu thereof a broader provision, to-wit, a clause providing that there should be deducted from this net value not only "any notes given on account of past premium payments on said policy issued to the insured," but, also, *"any other evidence of indebtedness to the company."*

It becomes plain, then, that if the policy in suit had been issued and the loan made under the provisions of the amendment of 1903, the case would present a boneless contention. But the Act of 1903 was not retrospective under settled rules of law. It did not hark back to cover outstanding policies and policy loans—the general rule being that legislative acts must be construed as prospective in intention and application and not retrospective unless their language calls for retroactive operation. [Haarstick v. Gabriel, 200 Mo. l. c. 244, *et seq.*; Manwaring v. Missouri Lumber & Mining Co., *Ibid*, l. c. 731, *et seq.*, and cases cited. See, also, sec. 15 of art. 2, Constitution.]

In fairness to appellant's learned counsel it should be said they do not contend the Act of 1903 was re-

troactive. As we grasp it, their contention is that the clause stricken out by the 1903 amendment was bad law, that, *contra,* the amendment is good law and puts the policy of our insurance laws in tune with the State and Federal Constitutions, and the general right of freedom of contract. This case may proceed, then, on the assumption that the amendment, of 1903 was not retroactive and therefore as a legislative utterance it in no wise controls the issues at bar.

II. Plaintiff stands upon the Smith case. Defendant concedes, *arguendo,* that the case at bar is not without similarity to the Smith case, but counsel say there are differences distinguishing it, in that: (1) "There is here an independent contract of commercial pledge distinct from the policy. (2) The entire loan was made for the purpose of payment of premiums. (3) There was an actual settlement and payment to the insured constituting a surrender of the policy."

Is there substance in these contentions? We think not; because:

(a) The loan and pledge contract in the case at bar is in no fair sense a contract distinct and independent from the policy. To the contrary, such loan and pledge was contemplated by the policy itself. It involved the policy, it may be likened unto an egg laid in the policy and subsequently hatched—*i. e.,* was made in pursuance of its terms. But were it conceded by way of argument that either the loan or the policy pledge were an independent contract distinct from the policy, yet neither the one nor the other were more "independent" in principle than in the Smith case. The case in hand, therefore, in the particulars now up for consideration should be controlled by that case, if it is to be followed.

(b) But it is asserted that the entire loan in the case at bar was made for the purpose of payment of premiums and that this ear-marks the case and dis-

tinguishes it from the Smith case. If this were true then under the *rationale* of that case plaintiff could not recover in this; for in that event on the wording of the statute as there interpreted the whole of the loan would be deducted from the net value before any of such net value should go to the purchase of extended insurance, and if application be made here on this basis plaintiff must be cast.

This contention seeks the uncovering of further facts. It will be observed that by the policy loan provision it is made a condition precedent to the granting of any loan whatever that the fifth, or some subsequent, anniversary of the insurance should happen before a loan can be made, and that premiums are to be paid in full to the time of the loan, including the premium for the entire insurance year then beginning. It will be observed that the whole policy plan contemplates the payment of premiums in cash when due. In this condition of things (given a policy loan, as here) a violent presumption at once arises, in the absence of evidence to the contrary, that as each annual premium fell due the insured paid it in cash and the insurer received it up to and inclusive of the fifth anniversary premium. If, now, this presumption is to be rebutted and overcome defendant has the laboring oar—the burden of proof is on its shoulders. How did it carry this burden? Well or ill? Manifestly, not well. And this is so because, as said by LORD MANSFIELD in Blatch v. Archer (Cowper 63, 65): "All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted." Applying that rule here, it becomes plain that if there were any notes or evidences of indebtedness to the company given by the insured or the insured and the beneficiary "on account of past premium payments," the evidence of such fact was peculiarly within the

knowledge and keeping of defendant company, and the failure to produce that evidence would seem fatal to defendant's claim. If there were any such loans or evidences of indebtedness it was an affirmative fact to be proved affirmatively by the best evidence of which the case was susceptible. The burden did not rest upon the plaintiff to disprove but on defendant to prove. When Secor was on the stand on cross-examination he testified by questions and answers as follows (referring to his gathering up papers belonging to Mr. Reifsnyder after his death):

"Q. Did you get any papers connected with the New York Life Insurance Company? A. No, sir.

"Q. Or with the policy? A. No, sir.

"Q. Did you ever find a copy of the loan agreement made with the company? A. No, sir.

"Q. You knew that there was one? A. No, sir.

"Q. You knew there was a loan made on the policy? A. I knew he made a loan and that the money went to pay premiums. All that money that he got went to pay premiums.

"Q. Did he tell you he defaulted on the premium of February 14, 1901? A. No, sir."

Again on re-examination he testified in relation to his knowledge of that matter, as follows:

"Q. Now, with respect to the making of this $1,400 loan, you were not a party to that, and knew nothing about the facts yourself at all, do you? A. No, sir, I didn't know it was made until afterwards.

"Q. You don't know how that $1,400 was paid to Doctor Reifsnyder, or where, do you? A. Only what was talked of afterwards. He said it all went for premiums is all I know.

"Q. Whatever you know about that is what some one else has told you? A. That's right."

Such is the evidence on which defendant relies. It is apparent from the foregoing that not a shred

of probative proof appears upon which defendant can base its contention that the policy loan in this instance was given on account of premium payments on the policy in suit. Mr. Secor testifies to nothing of his own knowledge. At most what he said was but the echo of what was told him by the insured after the event. The rights vested in the beneficiary under the old-line policy in suit do not hang dangling on the thin and precarious thread of such an admission as that. The answers of Mr. Secor are not closely responsive to the questions, and even if it were conceded they were responsive and that the testimony was competent yet it does not disclose *what premiums* the loan went to pay. Did he refer to past premiums on the policy in suit or to premiums on other policies? Had the insured borrowed the money from other sources to pay these premiums and did he repay such outside loans when the policy loan was made? If so, that would in a way explain what Secor meant. We think it clear that this bit of cloudy evidence, cropping out incidentally in cross-examination, should not be allowed any probative force, in the absence of the production of conclusive evidence that must have been in the possession of defendant—if any existed—to the effect that it had been carrying the past premiums payments of the insured in the way of notes or other evidences of indebtedness. The point is ruled against defendant.

(c) Finally it is urged by counsel that "there was an actual settlement and payment to the insured constituting a surrender of the policy." This contention is said to arise from the fact that at a certain time in June, 1901, the defendant company foreclosed its lien as pledgee of the policy and applied the bulk of its surrender value to the payment of the debt for which the policy and its accumulations stood as security, and sent the residue of such surrender value to

the beneficiary and the insured by its check of June 21, 1901, for $243.59. Counsel not only say that defendant had the clear commercial right to take the policy pledge, make the pledge agreement and to enforce that agreement according to its terms, notwithstanding our insurance law, but in the evolution of their argument they further set up the claim that under section 7900, defendant had the right to take a surrender of the policy ''for a consideration adequate in the judgment of the legal holder thereof,'' and that what was done in this instance amounts to a compliance with that statute and is protected by its terms.

If our statute is unconstitutional, if the Smith case is illy-considered law, then the first branch of defendant's contention is sound, otherwise not. But we remain satisfied with the reasoning and conclusion in the Smith case. We hold now, as we held then, that neither at the policy date nor by any supplemental subsequent contract, in legal effect an amendment to the policy, was it permissible to whittle away the mandate of the non-forfeiting statute requiring the net value of the defaulted policy to be applied to extended insurance. If the deductions made from that net value are notes coming within the statutory description, it is well enough, but if they fall within the interdiction of the statute it is bad. It matters not whether the mischief be done when the policy was executed and springs from its own loins by use of a policy term forbidden by law, or whether it sprang up afterwards by indirection; because it ought not to be held that ''one can do in a circle what he cannot do on a straight line.''

The remaining question is whether what defendant did in sending a check to the beneficiary and the insured for the remainder of the surrender value of the policy, after subtracting the loan and interest, amounts to a compliance with section 7900. That sec-

tion plainly contemplates that the relation of insurer and insured may be brought to an end if the insurer complies with its provisions, and the policy is surrendered "for a consideration adequate in the judgment of the holder." In this case we need not decide what would have been the result if the insured and the beneficiary, with full notice of all the facts, had accepted the check for the balance of the surrender value, had cashed it and appropriated its proceeds to their own use; because no such case is here. The evidence indicates that neither the one nor the other received the check, and it conclusively shows it was never cashed or appropriated. In this condition of things we cannot hold that the policy was surrendered to the company by that transaction, "for a consideration adequate in the *judgment of the legal holder thereof.*" "Judgment," as the word is used in the statute, implies deliberate action on knowledge of the fact, implies conscious consent. Here there was neither. Men's minds must meet in such contracts of surrender as contemplated by that section. Here there was no meeting of mind, and no estoppel; for estoppel proceeds on knowledge. An inference of acquiescence some times arises by retaining a check or an account rendered. But, manifestly, no such inference could arise in this case. Here the check was not retained, for it was never in fact received by the insured or the beneficiary. No man may retain, unless he receives. Nor would it seem reasonable to draw such inference of acquiescence if the check had been received by the insured, he being *non compos.* A policy of insurance may be forfeited by default in premium payment made by one *non compos.* [Klein v. Ins. Co., 104 U. S. 88.] In such case others might pay the premiums and prevent the default, but that principle does not apply here. [1 Am. and Eng. Ency. Law (2 Ed.), 452.] The point is ruled against the defendant.

III. . But defendant's learned counsel contend in effect that if we should hold the case at bar is controlled by the Smith case, then there is left to them the proposition that our statute as interpreted by that case is unconstitutional as an impairment of the right of contract. They put their finger on certain provisions in both the Federal and State Constitutions (to-wit, the 14th Amendment to the Constitution of the United States and section 4, article 2 of the Constitution of Missouri), which they say present an impassible barrier to the passage of such a law. We are not impressed with the soundness of this proposition. The defendant company had no right to do business in Missouri except by the permission of the laws of this commonwealth and under such constitutional conditions as those laws imposed. Knowing the law, it applied for and received permission to come into Missouri and make insurance contracts. When the contract in suit was entered into in 1894 there was a limitation put upon the right to make it. By that limitation, defendant could only write insurance contracts of a certain character, to-wit, policies not subject to forfeiture on certain contingencies and subject to have their net value computed and that net value applied to the purchase of temporary insurance after deducting loans of a specified character and no other. That statute was impliedly accepted by defendant when it accepted its license to do business. The defendant was not bound to come into the State of Missouri and write contracts of insurance attended with results indicated by the statute under consideration. That is not the question. Defendant did come in and did write insurance under the law. [Whitfield v. Ins. Co., 205 U. S. l. c. 495.] It took its right to write insurance *cum onere*—the bitter with the sweet. [New York Life Ins. Co. v. Cravens, 178 U. S. 389, s. c., 148 Mo. 583; Security Mutual Life Ins. Co. v. Prewitt, 202 U. S. 246; Waters-

Pierce Oil Co. v. State of Texas, 177 U. S. 28; Daggs v. Orient Ins. Co., 136 Mo. 382, s. c., 172 U. S. 1. c. 566; State *ex inf.* v. Standard Oil Co., 194 Mo. 1. c. 148, 149.] We rule the point against the defendant.

Other points are discussed by counsel, but are not deemed material to the issues of the case in its present form.

The premises considered, we conclude the court, *nisi,* did right in setting aside the nonsuit and reinstating the case for another trial.

The judgment is, accordingly, affirmed. All concur.