NITA B. McCALL, Appellant, v. INTERNATIONAL LIFE INS. CO., Respondent.

Kansas City Court of Appeals, March 5, 1917.

1. INSURANCE: Policy Loan: Non-payment of Premiums: Right to Reinstatement: Extended Insurance: Statute. Insured's policies each contained a provision that "if there shall be an indebtedness to the company and if any premium shall not be paid on or before the date when due, an amount of insurance equal to the face amount of this contract less the indebtedness will automatically continue from said due date as insurance." They also provided for reinstatement by payment of all premiums where evidence of insurability was furnished. On policy loan agreements, which made the policies collateral, insured borrowed the full loan value of each policy and defaulted in the payment of premiums at a time when the indebtedness due exactly equalled the cash value. The company notified insured of this fact and suggested that he reinstate by paying the premiums and furnishing certificate of insurability. The insured offered to pay the premiums but refused to furnish the certificate of health and afterwards, without reinstatement or complying with the conditions necessary therefor, tendered the amount of the debt and demanded his policies. The tender was refused and insured died with matters in this shape. The policies were in harmony with and subject to the extended insurance statute which provided that after deducting from three-fourths of the net value of the policies the amount of indebtedness due the company, the balance should be taken as a basis for extended insurance: *Held*, that there was nothing on which extended insurance could be based, there being nothing in the policies or in the statute requiring the continuation of any further liability in the way of insurance; and that tender of payment of the debt did not give insured the right to extended insurance on the policies, nor was the company bound to reinstate insured until the conditions of reinstatement were complied with.

2. ———: Default in Premiums: Extended Insurance: Estoppel. Because insurer urged insured to reinstate after forfeiture, pursuant to rights contained in the policy and in accordance with the terms thereof, did not estop insurer from applying the net value of the policies to payment of the loans secured thereby, leaving nothing on which extended insurance could rest. Nor did the designation of the policies as "lapsed" have any effect in that way, since the meaning of the term was that the policies were in suspension so long as the insured had a right to exercise the privilege of reinstatement conferred by and contained in the policies.

3. ———: **Policy Loans: Pledge.** Loan agreements, showing on their face that they were made subject to provisions of life policies that insured could borrow on the sole security of the insurance contracts and that they should be assigned as .security according to terms of loan agreements, are not loan and pledge contracts distinct and independent from the policies, giving insured right to extended insurance by repayment of loan after default in paying premium.

4. ———: **Reserve Value: Loan Agreement: Settlement.** A provision in a loan agreement that, upon default in paying premiums on policy pledged, the loan if unpaid may be foreclosed by satisfying the indebtedness, the balance if any to be applied to purchase extended insurance, is a reasonable means of settlement and not contrary to public policy.

Appeal from Jackson Circuit Court.—*Hon. Daniel E. Bird,* Judge.

AFFIRMED.

*McVey & Freet* for appellant.

*Humphrey, Boxley & Reeves* for respondent.

TRIMBLE, J.—This action is upon two insurance policies issued May 9, 1907, by the Great Western Life Insurance Company upon the life of Charles A. McCall in favor of Nita B. McCall, then his wife and now his widow, and plaintiff in this suit. Said policies, numbered 63 and 64, were for $3000 and $2000 respectively. In November, 1912, the business of the Great Western was reinsured by the International Life Insurance Company, hence the suit is against the latter company, it having stepped into the shoes of the former.

The policies contain the same provisions and differ only in amount and in premiums, which, in each policy, was a stipulated sum payable annually on or before May 9, with thirty days grace, throughout insured's life. Hence, the issues, under both counts of the petition, are identical.

On March 30, 1912, and after paying six full annual premiums, insured borrowed on policy No. 63 its full loan value, to-wit, $183, and on policy No. 64

its full loan value, to-wit, $122. On May 9, 1913, insured defaulted in the payment of the premiums due on that date. It is undisputed that on said date the indebtedness due from insured on the loan made to him on each policy exactly equalled the cash value of said policy, namely, $183 in one and $122 in the other. After defaulting in the payment of premiums no other premiums were paid by the insured. He died May 19, 1915. Suit was instituted on the policies August 17, 1915.

There is no question but that, if there had been no loan on each policy, three-fourths of the net value of each, computed as directed in section 6946, Revised Statutes 1909, would have been sufficient to have carried the policy, as extended insurance, beyond the date of insured's death. And in March, 1915, insured made a tender of, or sent to the Insurance Company, the full amount of said loans with interest, which the company declined to accept, and returned to the insured. If the defendant had accepted payment of said loans at that time, or, if it was required or bound to do so in law, then it is unquestioned that there was more than sufficient reserve value in each policy to carry the same beyond the date of insured's death. The controversy herein, therefore, grows out of the situation created by the existence of said loans, and the conduct of the insurer and insured with relation thereto *subsequent* to the insured's default in premiums on May 9, 1913. The position of the respective parties hereto may be stated thus:

Plaintiff's view is that when default occurred, notwithstanding the fact that on the date of the default in premiums the loan on each policy equalled the value thereof, so that deducting said debt from said value nothing remained on which extended insurance could rest, nevertheless, defendant did not deduct such debt nor apply the net value in payment thereof, nor attempt to do so, until after insured had tendered full payment of said debt with interest, and, therefore, defendant was bound to accept payment of said loan and must

now accept payment thereof (which is re-tendered in the petition), leaving the net value unincumbered by said debt and free to operate for the benefit of insured and his beneficiary by carrying said policy as extended insurance to the date of insured's death. In other words, plaintiff claims that the loan on each policy created the relation of pledgor and pledgee between the insurer and insured, wholly independent of and distinct from the policy and the relationships and rights created thereunder, and that such relation of pledgor and pledgee continued with no foreclosure on the part of the pledgee, and hence the policies continued with insured's right to extended insurance thereon, but subject to the lien of said pledge which insured, by his tender of the debt and plaintiff's renewal thereof, has removed, leaving plaintiff entitled to recover on the policies as extended insurance.

On the other hand, defendant's view is that since there was no value of the policies in excess of the loans thereon, there was no balance on which extended insurance could be based. Its contention is further that the relationships created by the loans were not independent of those created by the policies but are closely interwoven therewith and dependent thereon and must be so treated when considering the present rights of the parties. The defendant also contends that it did apply the net value of the policies to the payment of insured's debt and notified him of such action and that he acquiesced therein, but long afterwards attempted to create different rights for himself by making a tender of th debt, at the same time refusing to re-establish the policy by making the required showing as to health and paying up the defaulted premiums.

At the conclusion of the trial the court instructed the jury to find for defendant, which was done. Judgment being thereupon rendered in defendant's favor, the plaintiff appealed.

Prior to the amendment of 1903 (Laws 1903, p. 208), our non-forfeiture statutes, section 6946, Revised

196 M. A.—21

Statutes 1909, allowed only notes given for past premiums to be deducted from three-fourths of the net value of a policy leaving the remainder of such value as a basis for extended insurance. [Sec. 7897, R. S. 1899; Gillen v. New York Life Ins. Co., 178 Mo. App. 89; Smith v. Mutual Benefit Life Ins. Co., 173 Mo. 329; Christensen v. New York Life Insurance Co., 160 Mo. App. 486; Paschedag v. Metropolitan Life Ins. Co., 155 Mo. App. 185, 198.] But the 1903 amendment changed this and allowed *any indebtedness* due the company to be deducted. [Paschedag v. Metropolitan Life Ins. Co., supra; Burridge v. New York Life Ins. Co., 211 Mo. 158, 173.]

Each of the policies contained a provision that:

"In case of default in the payment of any premium or interest the company will reinstate the contract at any time, if not previously surrendered for its cash value, upon written application by the insured to the company at its Home Office with evidence of insurability satisfactory to the company, payment of all premiums that would have been paid in the intervening time if no default had been made, with interest thereon at the rate of five per cent. per annum computed from the premium due date, and payment of reinstatement, with interest at like rate, or any indebtedness existing at the time of default."

They further provided that:

"On demand in writing to the Home Office of the Company, the insured may borrow on the sole security of this contract the amount specified in the accompanying table for the year in which the loan is to be taken, subject to interest in advance, at the rate of five per cent per annum, provided the contract shall have been in force two years; the contract shall be assigned to the company as security according to the terms of the company's loan agreement, and the premiums on the contract shall be paid in full to the anniversary of the insurance next succeeding the date when the loan shall be made."

The policies each contained the following further provisions:

"If any premium shall not be paid on or before the date when due, and if there be no indebtedness to the company, the insurance will automatically continue from said due date as term insurance during the term, including the period of grace, specified in column 4 of the accompanying table; or in lieu of such term insurance, the company will indorse on this contract the amount of paid-up insurance, if any, specified in column 3 of the accompanying table, upon written request therefore made by the insured within said six months from said due date. Upon similar written request within said six months, and surrender of the contract the company will pay the cash value, if any, specified in column 2 of the accompanying table."

. . . . . . .

"If there shall be an indebtedness to the company, and if any premium shall not be paid on or before the date when due, an amount of insurance, equal to the face amount of this contract less the indebtedness, will automatically continue from said due date as term insurance, for the term, including the period of grace, which the excess of the cash value of the contract, if any, over the indebtedness, will purchase at the then age of the insured, according to the company's present table of single premiums. In lieu of such term insurance, provided the insured shall make written request therefor within six months from said due date, the company will, as the insured may elect, either indorse on this contract the amount of paid-up life insurance which said excess will purchase at the then age of the insured, according to the company's present table of single premiums, or upon surrender of the contract pay said excess in cash."

. . . . . . .

"If any premium shall not be paid on or before the date when due, the liability of the company shall be only as hereinbefore provided."

On March 30, 1912, the insured and the beneficiary signed a written application for a loan on each policy, and executed two "Policy Loan Agreements," one for $183 and the other for $122, which were delivered to the company along with the policies as collateral. Said "Policy Loan Agreements" were identical except in amount, so that only the material contents of one need be set forth. They recited that:

"Pursuant to the provisions of Policy No. (63 in one and 64 in the other), issued by the Great Western Life Insurance Company on the life of Charles A. McCall, the undersigned have this day obtained a cash loan from said company of the sum of (here $183 was specified in one and $122 in the other), the receipt of which is hereby acknowledged, conditioned upon pledging as collateral said policy with said company as sole security for said loan and giving assent to the terms of this Policy Agreement: therefore,

In consideration of the premises, the undersigned hereby agree as follows:

1. To pay said company interest on said loan at the rate of five per cent. per annum, payable in advance from this date to the next anniversary of said policy, and annually in advance on said anniversary and thereafter.

2. To pledge, and do hereby pledge, said policy as sole security for the payment of said loan and interest and herewith deposit said policy with said company at its Home Office.

3. To pay said company said sum when due with interest, reserving, however, the right to reclaim said policy by repayment of said loan with interest at any time before due, said repayment to cancel this agreement without further action.

4. That said loan shall become due and payable—

(a) Either if any premium on said policy or any interest on said loan is not paid on the date when due, in which event said pledge shall, without demand or notice of any kind, every demand and notice being

hereby waived, be foreclosed by satisfying said loan in the manner provided in said policy.

(b) Or, (1) on the maturity of the policy as a death-claim or an endowment; (2) on the surrender of the policy for a cash value; (3) on the selection of a discontinuing option at the end of any dividend period. In any such event the amount due on said loan shall be deducted from the sum to be paid or allowed under said policy.''

It will be observed that the policies were issued in 1907, after the amendment of 1903 was made, and hence the policies are subject to the law as it now stands, which says that ''after deducting from three-fourths of such net value . . . any evidence of indebtedness to the company . . . *the balance shall be taken as a net single premium* for'' the insurance therein provided for, which is, for brevity, termed extended insurance. In other words, the statute requires that, of the three-fourths net value of the policy, *whatever balance there is,* in excess of any indebtedness due the company, shall be considered and taken to be a net single premium for the extended insurance. It would seem that *if there was no balance,* there would be nothing on which extended insurance could rest, and hence nothing in the law compelling extended insurance where that is the situation.

When we turn from the requirements of the *law* to the terms of the *policy,* we find that its provisions are in harmony with and not in conflict with the law. It provides: 1. That upon default in premiums, and there is *no* indebtedness to the company, extended insurance *automatically* continues, thus giving to insured the same benefits which section 6946 enforces (and perhaps greater benefits since the policy does not require three annual payments to be made, as does the statute); or, if insured wants a paid-up policy, in lieu of extended insurance, he will be given that, as enforced by section 6947; or, the company will pay the cash surrender value as provided for in section 6949, Revised Statutes 1909. 2. If there *is* an indebtedness to the company

when default is made in payment of premiums, then extended insurance *automatically continues* for the term which the *excess* of the cash value of the policy *over the indebtedness* would purchase. Provision also was made for paid-up insurance or for a surrender at its cash value at the election of the insured. It being conceded that at the time of default in the premiums the indebtedness equalled the value of the policies and consequently there was no excess in value above the indebtedness, we fail to see anything either in the statute or in the policies requiring the continuation of any further liability in the shape of extended insurance.

Is there anything in the facts or in the conduct of the company, at the time of and subsequent to the default in the payment of premiums, that *compels* the company to grant extended insurance or which prevents it from applying the indebtedness to the extinguishment of the debt leaving nothing of value in the policy on which extended insurance could rest? Or could the insured, by tendering the amount of the debt in February, 1915, while still in default of premiums and refusing to give a health certificate, *compel* the company to accept payment of the indebtedness *in cash* instead of treating said indebtedness as being liquidated by the net value of the policies?

It would seem that if there is nothing in the law, nor in the wording of the contracts between them, to compel the company to grant extended insurance, or to accept cash rather than the value of the policies after a default in the premiums, then there is no reason why plaintiff is entitled to say that the company must do so now; unless indeed, the company by its conduct *misled* the insured to his disadvantage whereby it is estopped from standing upon its rights. However, there is no evidence of this and no pleading of estoppel.

It seems that after default was made in the payment of the premiums due May 9, 1913, and after the expiration of the thirty days of grace allowed therefor, the company, by letter dated June 19, 1913, notified

insured of that fact, and informed him the policies had "elapsed" on that account, but that if he would send a certain sum together *with a certificate showing he was in good health* (blank for which was inclosed), the company would consider revival of. policies at once and arrange for an extension of four months on the balance due on the premiums. On June 25, 1913, insured wrote the company saying, "I do not know what standing I have, if any, with your company now" and directing it, if the insurance had not lapsed, to apply inclosed check, and two notes therein referred to as having been sent the week before, to payment of premiums; but if the policies had lapsed to return the check and notes. The insured, however, did not send any health certificate. The company on June 27, 1913, wrote saying the notes had come but the check had not, but that, in view of the fact that the insurance had lapsed because of default in the payment of the premiums when due, it was necessary for insured to furnish a medical health certificate (blank for which was inclosed) before the company could consider the question of reinstatement. On July 2, 1913, the company wrote insured saying the check had come but that undoubtedly by this time insured had received the company's letter of June 27, so that if he would send the Medical Health Certificate duly executed before some reputable physician of his place, they could then consider the reinstatement of his insurance. The letter went on to say that since the premiums were not received during the Grace Period, the policies stood as lapsed on the records, but the company hoped he would not allow them to remain thus, and that consequently the company expected to receive the Health Certificate so that; if it was found satisfactory to the Medical Department, reinstatement could be duly effected, and that in the meantime his remittance and notes for the defaulted premium would be simply held subject to his order.

July 11, 1913, insured wrote to the company saying he had not intended to let his policies lapse but that as they were now in that condition he would rearrange his insurance. He then requested that the company return the check and notes sent to cover the defaulted premiums, and to cancel the loans on the policies and return to him the papers he should have. To this letter, the company, on July 18, 1913, replied urging him not to give up the idea of reinstatement and not to allow the policies to remain in their present condition, ''as the *cash loan* that you have realized on each *is equivalent to the cash value at the present time, which would not return you, therefore, anything as a termination cash value.''* The letter then went on to give reasons why insured should reinstate himself, and closed by urging him to furnish the Health Certificate (blank for which was enclosed), and agreeing to pay the physician's compensation therefor so that he would be at no expense for renewal. Insured made no attempt to furnish the Health Certificate or at least did not do so, but on July 25, 1913, wrote the company to ''kindly return the articles requested by me in my last communication without further delay.'' Again, on August 7, 1913, insured wrote the company saying he had written for the return of the draft and two notes sent to cover defaulted premiums, but had heard nothing from the company. The company answered by inclosing to him the check and two notes sent to cover defaulted premiums; but said that it did not believe he could afford to reach a hasty decision in the matter, and suggested that he reconsider his decision, and that the company would be glad to hear from him at any time in regard to reinstatement and that the company could not be regarded as being unjust in requiring insured to furnish evidence of insurability satisfactory to the company in connection with revival, especially as the insurance lapsed through no fault of the company.

Nothing further was heard from insured until December 16, 1913, when he wrote the compny referring to his two policies as having "lapsed last May" and mentioning the loans thereon, and saying that he had asked for the papers evidencing the loan and bearing his and his wife's signature, but they had never been sent to him. He closed by asking for the return of the papers at once. To this letter, the company, on December 22, 1913, answered, referring to the policies as having "expired on account of your failure to meet your May 9, 1913, deposit under each," and saying the company could not return the papers executed for the outstanding loans under the policies because those papers were the only evidence the company had in its possession that the loans were made, "and were we not to hold your policies with the Loan Agreements, there would be nothing to indicate that you would not be entitled to a Cash Value, Automatic Extended Insurance Value, or Paid-up Value at this time." The letter closed by saying that after he had thought over the matter he would understand "the company's position in this matter and why it is absolutely essential that they hold these policy loan agreements in their possession for the reasons assigned."

Insured made no reply to this letter and nothing further was heard from him for more than a year thereafter or until February 25, 1915, when he sent a telegram asking the company to advise him by wire the amount of loan against the policies. The company immediately wired back that there was $183 on Policy 63 and $122 on Policy 64. Thereupon, at some time between February 25, and March 1, 1915, insured sent a draft for $305 to pay same and asked that the policies be returned to him at Manhattan, Kansas.

To this, the company, on March 1, 1915, replied that they could not apply the remittance to the payment of the loan as the policies were in a lapsed condition. The letter suggested that insured sign new

loan agreements for $140.42 and $207.57 and revive
the policies by applying the cash he had sent where-
by his premiums would then be paid to May 9, 1916.
The letter went on to say that before reinstatement
could be considered it was necessary for insured to fur-
nish a medical health certificate (blank for which was
enclosed). The letter then urged insured to take the
steps necessary for reinstatement by submitting the
health certificate and executing the new loan agree
ments, so that, if the health certificate was satisfactory
to the Medical Department, the policies could be re-
instated. Blanks for the new loan agreements were
also inclosed, and the letter ended by saying that it
"must be understood that our offer of premium loan
settlement does in no way waive the forfeiture pro-
vision of your policy and if the policies are to be re-
instated the above requirements must be complied
with." Thereupon, on March 3, 1915, insured wrote
the company saying: "I have no desire to reinstate
the policies at this time, but desire to take advantage
of clause 4 of loan agreement and repay the loan on the
policies." The letter then inclosed a draft for $17.40
to cover interest on the indebtedness and asked that
the policies be returned. To this, the company, on
March 9, 1915, wrote saying:

"Under the terms of your policy the loan if unpaid
at the time the next succeeding premium is due is
liquidated by the Cash Value and the policy remains
entirely out of force until either the satisfactory medi-
cal health certificate is furnished and back premiums
together with interest is paid up, so we could not ac-
cept your money to pay off this loan at the present
time."

The letter then suggested another method by which,
with the money he had sent, he could obtain insurance
for a term of four years or more, and inclosed a con-
tract to that effect for him to look over, at the same
time telling him he must furnish satisfactory health
certificate and that if he was in bad health it would
be useless to have himself examined. The letter closed

by saying the company held his remittance subject to his order and awaited his further communication. Again, on March 23, 1915, the company wrote asking whether insured would not accept their offer of a five year term contract by sending in his application therefor together with satisfactory medical examination. The letter then said:

"We are holding in our office bank draft for $322.40 which you wished to use in liquidating old loan on policies of above numbers which have already lapsed. As previously advised we cannot apply this for the reason that loans on your policies were liquidated by the cash value of the old contracts which have expired. I am returning the bank drafts which you may have cancelled. If you decide to take the five year term contract as outlined in my letter of the 9th, kindly attach bank draft for $74.90 to your application."

On May 15, 1915, the company wrote another letter, evidently in answer to one insured had caused to be sent to it, for the company's letter says:

"We are just in receipt of a letter from Mr. Wilburt requesting information as to whether or not the Company would place your policies on extended insurance providing you paid off the loan. As previously advised this cannot be done unless the policy be reinstated, back premiums paid, and evidence of insurability furnished us. This proposition was made to you some time ago."

With matters standing thus, insured, as stated, died on May 19, 1915.

By the terms of the Loan Agreements, insured's indebtedness to the company was due on the same date the premiums were payable. Hence the indebtedness was due when insured defaulted in his premiums on May 9, 1913. Now, while there does not seem to have been any actual or physical cancellation of the loan agreements, yet it is clear that, from and after the default in premiums, the company treated the indebtedness and the net value of the policies as *balancing each*

*other* on that date, and took the position that *unless* the policies were reinstated in accordance with the terms thereof there was no value in them. And this position was at once plainly stated to the insured. The policies provided that in case of default in premiums they would be *reinstated at any time,* if not previously surrendered for their cash value, provided application was made therefor *with satisfactory evidence of insurability* and the payment of all back premiums with interest at five per cent. *together with* interest at like rate on any indebtedness existing at time of default. Consequently, the company, in urging the insured to reinstate, was not waiving any rights it had under the law by reason of the non-payment of premiums. It was merely extending a privilege or right which the contract required it to give *provided* insured complied with the requirements necessary for reinstatement. And although, in the correspondence between them, the company urged insured to reinstate, yet it was clearly set forth that as long as the insured remained without reinstatement, the policies had no value. And after insured had, by his letter of July 11, 1913, indicated an intention to allow the policies to remain in that condition, the company, by its letter of July 18, 1913, urged him not to give up the idea of reinstatement because, if he did that, the indebtedness on the policies *equalled their value, leaving nothing in them for him.* This was *more than a year and a half* before he tendered payment of the loan. So that there can be no question but that the company clearly evinced its determination to use the net value of the policies in payment of the indebtedness and so treated the matter, unless insured would exercise his right of reinstatement granted by the policies. The insured declined to exercise that right, and, as the loan agreements provided that the policies might be regarded as "sole security" for the  debt, the company had the right, after default was made in the premiums, to use the net value of the policies in payment of the debt, unless indeed the statute, or the terms of the insurance

contracts forbade that right. But so far as the statute is concerned, it does not say that extended insurance shall be granted at all events, but only in case there remains any excess of value after any indebtedness is deducted; and so far as the policies are concerned, they say that, if there is *no* indebtedness, then extended insurance will continue automatically, but if there *is* indebtedness, then only such extended insurance will continue as is created by the value that is *in excess of the indebtedness.* There being nothing in the statute or in the policies to forbid the company from offsetting the debt with the value of the policies (the two being equal) and nothing in the company's conduct waiving its right to do so, or estopping it from so doing, it is not seen how insured, after defaulting in his premiums, can insist that the company shall forego its right to cover said indebtedness with said net value, or that insured's beneficiary can make such insistence now.

But plaintiff says the relation of pledgor and pledgee was created and that relation was never changed, and insured had the right to pay off his debt at any time even after default, and having offered to do so, plaintiff may do so at this time. This would be true if the loans were matters wholly separate and independent of the insurance contracts. But they are not. As said in Burridge v. New York Life Ins. Co., 211 Mo. 158, l. c. 174:

"The loan and pledge contract in the case at bar is in no fair sense a contract distinct and independent from the policy. To the contrary, such loan and pledge was contemplated by the policy itself. It involved the policy, it may be likened unto an egg laid in the policy and subsequently hatched—i. e., was made in pursuance of its terms."

The policies provided that the insured could borrow the loans on the sole security of the insurance contracts and that they should be assigned as security according to the terms of the loan agreements. And the loan agreements show on their face that they were

made "pursuant to the provisions" of the policies, and that the loans were made and obtained "conditioned upon pledging as collateral said policy with said company as sole security for said loan and giving assent to the terms of this Policy Agreement," among which was the "right to reclaim said policy by repayment of said loan at any time *before due.*" The only provision for repayment of the loan, *after* default in premiums, appears in connection with insured's right of reinstatement of the policy and is the fourth and final condition necessary for that reinstatement. Hence, insured cannot exercise the right of repayment of the loan *after* default except in connection with reinstatement of the policy. And having agreed in all of the contracts that the company may treat the policy as sole security for the debt, insured was not entitled, after defaulting in his premiums, to compel the company to forego that right, unless he complied with the condition giving him the right to pay the loan then. In other words, insured, after default, *did not have the right of repayment without reinstatement.* The right he had was not one of repayment but of reinstatement And he chose not to exercise that right. There is nothing in that situation which is inconsistent with sound public policy or violative of the substantial rights of the insured. [Ruane v. Manhattan Life Ins. Co., 186 S. W. 1188, 1191.]

The insured forfeited nothing. He obtained a loan which equalled the net value of each policy at the date of his default, and, in so obtaining that loan, he lawfully contracted away any right he otherwise would have had to extended insurance either under the statute or under his policies. We say "lawfully" because the statute now allowes *any* indebtedness to the company to be considered before requiring any net value to be taken as a basis of extended insurance.

The policies by their terms automatically adjusted the rights between the insured and insurer, and the values thereof balanced and offset the indebtedness. Nothing remained upon which extended insurance could

be based; and insured at one time acquiesced in the situation and did so for over a year and then tried to make a new contract inconsistent with the terms of the old, to which defendant would not agree.

We cannot see how the use of the word "lapsed" in the company's correspondence, could change the rights of the parties. If the word "lapsed" in insurance parlance means that the policies were "temporarily in suspension" that was true since, under the right of reinstatement *at any time* contained in the policies, they were subject to revival in that way and so could not be deemed wholly extinct so long as there was a chance of insured's exercising that right.

We are of the opinion that the plaintiff, under the conceded facts in the case, is not entitled to recover, and accordingly the action of the trial court, in peremptorily instructing the jury to return a verdict in favor of the defendant, is upheld and the judgment affirmed. The other judges concur.